UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------- X

ROBERT GIST,

                                      Movant,

                          -against-

UNITED STATES OF AMERICA,

                                  Respondent.

---------------------------------------------------------------- X

|  |
|---|
| USDC SDNY |
| DOCUMENT |
| ELECTRONICALLY FILED |
| DOC #: _____ |
| DATE FILED: 8/24/2021 |

1:19-cv-5095-GHW
1:16-cr-656-6-GHW

MEMORANDUM OPINION &
ORDER

GREGORY H. WOODS, United States District Judge:

## I.   INTRODUCTION

In 2018, Robert Gist signed a plea agreement with the United States and accepted responsibility for two federal crimes: conspiracy to distribute and possess with the intent to distribute marijuana in violation of 21 U.S.C. § 846 and use of physical force against a witness, in violation of 18 U.S.C. §§ 1512(a)(2), 1512(j), and 2. This Court sentenced Mr. Gist to 77 months of imprisonment—a sentence at the bottom of the guidelines sentencing range agreed upon by Mr. Gist.

Mr. Gist has moved to vacate his conviction and sentence, claiming that his counsel provided him with ineffective assistance in violation of the Sixth Amendment, and that Mr. Gist did not enter his plea agreement knowingly and voluntarily. Mr. Gist also argues that the Government violated its discovery obligations under *Brady v. Maryland* by failing to produce certain pieces of evidence that were in the possession of the Bureau of Prisons before Mr. Gist entered his plea. The Court has reviewed the parties' submissions and heard testimony during an evidentiary hearing held on December 8, 2020. Because the Court finds that Mr. Gist did not ask Mr. Goldsmith to file a notice of appeal in his case, and that, under the circumstances, Mr. Goldsmith was not obligated to

consult with him about filing an appeal, and for the other reasons that follow, Mr. Gist's petition to vacate his conviction and sentence is denied.

## II.    FINDINGS OF FACT

On September 29, 2016, Mr. Gist and 21 others were indicted and charged with conspiring to distribute, and possessing with the intent to distribute, marijuana, oxycodone in the form of Percocet tablets, and mixtures of substances containing crack, heroin, and cocaine.  Dkt. No. 1.[1] Mr. Gist was arrested on October 12, 2016.  *See* Dkt. No. 694 at 2.  On February 4, 2017, while in custody in the Metropolitan Correctional Center in Manhattan, Mr. Gist and his brother and co-defendant, Paul Gist, attacked another inmate.  On January 17, 2018, the Government filed a superseding indictment, charging that the Gist brothers had attacked the victim because they believed he was a cooperating witness.  Dkt. No. 438.  The superseding indictment charged Mr. Gist with three additional crimes:  possessing a firearm in furtherance of narcotics trafficking, using physical force to tamper with a witness, and knowingly causing bodily injury to retaliate against a witness.  *Id.*

### A.    Prior Counsel and Plea Offers

Mr. Gist first appeared before the Court on October 12, 2016.  At that time, Mr. Gist was represented by Ezra Spilke, an attorney appointed to represent Mr. Gist under the Criminal Justice Act (the "CJA").  Dkt. Nos. 68-69, 71; December 8, 2020 Evidentiary Hearing Transcript ("Evidentiary Hearing Tr.") at 35:15-17.  Mr. Gist was not satisfied with Mr. Spilke's representation, and on June 2, 2017, he requested that new CJA counsel be appointed.  Dkt. No. 184; Evidentiary Hearing Tr. 35:18-20.

The Court appointed Kelly Currie and Glen McGorty of Crowell & Moring, LLP ("C&M") as Mr. Gist's replacement counsel.  Government Exhibit ("GX") 8 ¶ 1.  Ms. Currie and Mr.

---

[1] All citations to the docket refer to criminal case unless otherwise noted.

McGorty represented Mr. Gist from June 9, 2017 through January 30, 2018, and during that time, met with him approximately nine times for several hours each. *Id.* During the course of C&M's representation, Mr. Gist received two plea offers from the Government. *Id.* ¶ 2. The first plea offer, dated April 12, 2017, was originally transmitted to Mr. Spilke and was later presented to C&M. *Id.* ¶ 3. The April 12, 2017 plea offer required Mr. Gist to plead guilty to a charge of conspiracy to distribute cocaine base in violation of 21 U.S.C. § 841(b)(1)(C), with enhancements for possession of a dangerous weapon, the use of violence, and obstruction of justice. *Id.* The advisory sentencing guidelines range for that plea offer was 262-327 months' imprisonment, with no mandatory minimum term of imprisonment. *Id.* The April 12, 2017 offer contained an appeal waiver provision, which provided that Mr. Gist could not appeal if the Court imposed a sentence within or below the applicable sentencing guidelines range. *Id.* C&M reviewed that plea offer with Mr. Gist, including the appeal waiver, and he rejected the offer. *Id.*

The Government offered Mr. Gist another plea deal on September 1, 2017. *Id.* ¶ 4. That offer required Mr. Gist to plead guilty to the charge of conspiracy to distribute marijuana in violation of 21 U.S.C. § 841(b)(1)(D), and gun possession in furtherance of that narcotics conspiracy in violation of 18 U.S.C. § 924(c). *Id.* The advisory sentencing guidelines range for that deal was 120 months of imprisonment, with a mandatory minimum term of 60 months of imprisonment. *Id.* It too contained an appeal waiver with the same terms as the prior offer. *Id.* Mr. Gist also rejected that plea offer.

C&M advised Mr. Gist against going to trial, based on, among other things, the potential sentence that he faced of up to 30 years, the lack of defenses to the narcotics conspiracy charge, and the difficulty of overcoming the anticipated evidence to show that he did not possess a gun, or aid and abet others who did, with respect to the 924(c) firearms charge. *Id.* ¶ 7. C&M advised Mr. Gist

to plead guilty rather than proceed to trial and that only the judge could determine his sentence.  *Id.*
¶¶ 8-9.

On or about September 27, 2017, following his rejection of the Government's offers, Mr.
Gist told C&M that he was willing to accept an agreement that contained a gun enhancement on a
narcotics conspiracy count.  *Id.* ¶ 6.  Mr. Gist testified that he did not accept the earlier deals because
he did not approve of the charges and the associated guidelines ranges contained in the agreements.
Evidentiary Hearing Tr. 20:6-8.  Mr. Gist also testified that he had sought new counsel because he
had argued with his prior attorneys about the best strategy for his case, and that they advised him
that his "best bet [was] to take a plea agreement instead of going to trial[,]" which he felt indicated
that they would not "put their all into fighting" at the trial.  Evidentiary Hearing Tr. 18:19-19:5;
36:20-24.

Mr. Gist asked for the Court to appoint alternative counsel for him.  The Court held a
hearing to discuss Mr. Gist's request on January 25, 2018.  See Change of Counsel Transcript, Dkt.
No. 445 ("Change of Counsel Tr.").  After an extensive colloquy by the Court, Mr. Gist's counsel
explained that they had a break down in their ability to communicate with their client.  *See, e.g.,*
Change of Counsel Tr. at 15:6-12 ("we feel that we're at an impasse in our ability to communicate
with our client . . . .").  The Court advised Mr. Gist of the impact of changing his counsel at that
point in the case—his second change of counsel—and, in particular, highlighted the impact on his
new counsel's ability to prepare for the upcoming trial.[2]  The Court also provided Mr. Gist the

---

[2] Change of Counsel Tr. at 21:3-20.  ("THE COURT:  Now as I said earlier, even if I do appoint new counsel for you
here today, or if I determine that I will permit these lawyers to withdraw and undertake an effort to find new counsel to
replace you, the trial dates for this case will not change, nor will the dates for our final pretrial conference, nor do I
expect to revisit any of the other procedural issues in the case.  We have just heard counsel for you describe the
voluminous discovery in the case.  If I were to grant your request to bring on board new counsel, that new lawyer would
have to, in this relatively short period of time, gain familiarity with all of the information that has already been produced
and reviewed by your current counsel in order to prepare for the trial in this case.  So if I grant this request, that will be
one of the many consequences of your decision.  So given that we're on the eve of trial that there are a number of other
defendants whose counsel also have set aside that period of time, I will not change that deadline.")

opportunity to confer with the Criminal Justice Act ("CJA") attorney on duty that day about his desire to change counsel before acting on the request. Notwithstanding the imminence of trial, Mr. Gist asked that the Court appoint new counsel for him. Change of Counsel Tr. at 24:9-21. At Mr. Gist's request, the Court did so.

### B.   Mr. Goldsmith is Appointed

On January 30, 2018, Aaron Goldsmith, the attorney who is the subject of Mr. Gist's ineffective assistance of counsel claims, replaced Ms. Currie and Mr. McGorty. *See* Dkt. No. 445. Mr. Goldsmith has practiced criminal defense litigation for nearly 18 years, represented hundreds of criminal defendants, and done about 22 criminal trials. Evidentiary Hearing Tr. at 55:23-56:7 ("For the last—really almost the entirety of my practice, I have done criminal defense litigation. I also did some commercial litigation. But at least, at any given time, at least half of my cases or more are criminal defense, both in state and federal courts."), 56:23-25, 57:1-3. Mr. Goldsmith was a member of the CJA panel from 2013 to 2019, a position he held at the time he was appointed to represent Mr. Gist. *Id.* at 56:8-22.

Mr. Gist's trial was scheduled to begin on March 5, 2018, which gave Mr. Goldsmith roughly a month to prepare for trial after his appointment. Evidentiary Hearing Tr. 57:18-21. After his appointment, Mr. Goldsmith communicated with C&M about the case by both phone and email. *Id.* 57:22-58:15. Mr. Goldsmith testified that through those conversations, he learned the attorney-client relationship between Mr. Gist and C&M had broken down because of C&M's inability to secure Mr. Gist a plea deal "within the parameters that he wanted." *Id.* C&M also provided Mr. Goldsmith with "a digest or memorandum" that described C&M's prior meetings with Mr. Gist in synopsis form, in addition to C&M's entire case file. *Id.*; *see also* GX-2J. Mr. Goldsmith testified that he also spoke with the Assistant United States Attorneys assigned to Mr. Gist's case as part of his trial preparation. Evidentiary Hearing Tr. at 59: 9-11. During the course of Mr. Goldsmith's

discussions with C&M and the government's attorneys, he learned that prior plea offers had exceeded ten years, and, as such, were not of interest to Mr. Gist.  Evidentiary Hearing Tr. 59:12-21.

Mr. Goldsmith met with Mr. Gist twice before he obtained the final plea offer from the Government.  *Id.* at 65:3-9.  During the December 8, 2020 evidentiary hearing, the Court heard testimony from both Mr. Gist and Mr. Goldsmith regarding the content of those meetings.  The first meeting took place on January 31, 2018.  *Id.* at 60:3-16.  Mr. Gist insists that he did not discuss a plea deal with Mr. Goldsmith prior to receiving his final plea deal, and that they were focused on preparation for trial.  *Id.* at 20:12-22:9.  Instead, Mr. Gist stated that he would not accept any plea offer and that he wanted a new lawyer.  *Id.*  However, Mr. Gist did admit during the evidentiary hearing that during their first meeting, Mr. Goldsmith informed him that he was asking the Government to offer Mr. Gist a plea.  *Id.*  That statement is inconsistent with Mr. Gist's other statements to the effect that he did not have any discussions with Mr. Goldsmith about a plea deal prior to February 15, 2019, and that he never had any discussions with him about plea deals in general.  Accordingly, the Court does not credit Mr. Gist's testimony to the extent that he asserts that he did not discuss plea deals or agreements, or their terms, with Mr. Goldsmith at that time.

Mr. Goldsmith testified that after he was retained, he met with Mr. Gist to discuss his goals for plea negotiations, in addition to the nature of expected trial evidence and trial strategy.  Mr. Goldsmith testified that during their first meeting, Mr. Goldsmith and Mr. Gist discussed Mr. Gist's goals from any plea negotiation and the risks of proceeding to trial.  According to Mr. Goldsmith, Mr. Gist expressed that he did not want to proceed to trial "unless he could get what he wanted[,]" and that he was hoping to get a plea deal that met his specifications because he would be the first to go to trial.  *Id.* at 61:8-12.  Mr. Goldsmith noted that Mr. Gist "did not want to have a 924, and he wanted to have a maximum of 10 years.  He also did not feel that he wanted to plead guilty to the harder narcotics that were included in Count One, which would have included the heroin, the

6

cocaine, and the crack." *Id.* at 61:13-61:19; *see also* 62:7-17 ("the parameters were that he did not

want to take a 924, that he did not want to have a (b)(1)(A) equivalent, meaning the ten years plus,

and he did not want or—I should say that he wanted a cap.  He would be willing to take a cap of ten

years.").  During the evidentiary hearing, the Government introduced Mr. Goldsmith's

contemporaneous handwritten notes from the January 31, 2018 meeting which corroborated his

version of events.  *Id.* at 62:18-64:7("[a]t the very top, which would indicate chronologically, it was

the beginning of our conversation, I have listed:  Defendant does not want a 924.  Defendant does

not want a (b)(1)(A) equivalent, will take a ten-year cap . . . 'Will take MJ or marijuana plus gun

bump' . . .  Will not cop to all drug guidelines and gun bump.  'Will not cop for what the others have

done.'").  After reviewing all of the evidence, the Court is persuaded by Mr. Goldsmith's version of

events, which are corroborated by his contemporaneous notes.  Furthermore, Mr. Gist's description

of his conversations with Mr. Goldsmith is inconsistent.  The Court finds Mr. Goldsmith's

description of the January 31, 2021 meeting to be credible and therefore credits his version of

events.

　　　　While Mr. Goldsmith continued to prepare for trial, he communicated with the Government

almost daily about the possibility of a plea agreement that satisfied Mr. Gist's conditions.  *Id.* at 64:8-

65:2.  Mr. Goldsmith met with Mr. Gist again on February 13, 2018 to discuss trial preparation.  *Id.*

at 65:3-6; 98:2-99:9.

### C.    The Government's February 14, 2018 Plea Offer

Mr. Goldsmith received a plea offer from the Government on February 14, 2018, which was set to expire on February 16, 2018, two days later. *Id.* at 65:10-14; *see* GX-4 (the "Plea Agreement"). If Mr. Gist agreed to the terms of that agreement, he would plead guilty to two counts: conspiracy to distribute and possess with the intent to distribute marijuana and assaulting a witness. The Plea Agreement calculated the offense level for Mr. Gist's two offenses as 25, giving effect to agreed-upon enhancements for possession of a firearm, causing physical injury to a person to obstruct the administration of justice, and substantial interference with the administration of justice. The Plea Agreement anticipated that Mr. Gist's offense level would be adjusted downward to 22 if Mr. Gist accepted responsibility for his offenses. The parties stipulated that Mr. Gist had eleven criminal history points, landing him in criminal history category V. As a result, the parties' stipulated advisory sentencing guidelines range was 77-96 months of imprisonment. Evidentiary Hearing Tr. 65:19-66:3; *see* GX-4. This deal represented a substantial improvement over the Government's original plea offers—including the plea offer recommended by Mr. Gist's prior counsel.

Pursuant to the Plea Agreement, Mr. Gist was to agree that he understood that his sentence would be determined solely by the Court and that the Government was not making any representations as to what sentence Mr. Gist would receive. GX-4 at 5. The Plea Agreement contained an appeal waiver that was identical to the provision contained in the Government's prior two plea offers. GX-8 ¶¶ 3-4. That agreement provided, among other things, that Mr. Gist would not file a "direct appeal; nor bring a collateral challenge, including but not limited to an application under [28 U.S.C. 2255] and/or Section 2241; nor seek a sentence modification pursuant to [18 U.S.C. 3582(c)] of any sentence at or below the Stipulated Guidelines Sentence of 77 to 96 months' imprisonment." GX-4 at 6. Mr. Gist also specifically agreed "not to appeal any fine that is less than

or equal to $150,000 . . . ." *Id.* The agreement also stated that Mr. Gist agreed that he waived his

right to withdraw his plea or to attack his conviction on the basis that

> the Government has failed to produce any discovery material, *Jencks* Act material,
> exculpatory pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), other than information
> establishing the factual innocence of the defendant, and impeachment material
> pursuant to *Giglio v. United States*, 405 U.S. 150 (1972), that has not already been
> produced as of the date of signing this Agreement.

*Id.*

In Mr. Goldsmith's (accurate) opinion, this plea offer was "substantially more favorable"

than the previous offers Mr. Gist had received in that it was consistent with the goals that Mr. Gist

had identified during the January 31, 2018 meeting: it was 40 months or so less than the prior

offers, did not require him to plead guilty to the harder narcotics contained in the conspiracy count,

but instead allowed him to plead guilty to the marijuana offense. The agreement did not require him

to plead guilty to a firearms offense under 18 U.S.C. § 924; as a result, the plea did not require that

he accept a mandatory minimum sentence. Evidentiary Hearing Tr. 66:4-67:1.

> ### D. Mr. Goldsmith and Mr. Gist's Meeting(s) Regarding the February 14, 2018 Plea Offer.

Mr. Goldsmith emailed Mr. Gist on the morning of February 15, 2018 to ask him if he

would be interested in a plea offer. Evidentiary Hearing Tr. at 22:15-23. Mr. Gist indicated that he

was, and Mr. Goldsmith visited him at the MCC that afternoon to discuss the offer. *Id.* at 23:15-17,

23:20-25:5, 68:3-8. Here, Mr. Gist's and Mr. Goldsmith's versions of the facts again diverge.

A summary of Mr. Gist's account of that meeting follows: Mr. Gist maintains that he did

not accept the deal at this meeting, that he only informed Mr. Goldsmith that he was interested, and

that he expected Mr. Goldsmith to ask the Court for an extension of the expiration deadline. *Id.* at

24:22-25:5. Mr. Gist testified that the meeting was "very quick" and that Mr. Goldsmith said he

would talk to the Court to see if he could get the expiration date pushed back because he was flying

out that day. *Id.* at 24:2-11. Mr. Gist says that they discussed the terms of the plea offer during the

meeting, including his guideline ranges, his criminal history category and the charges.  *Id.* at 24:14-18.
Mr. Gist further testified that he told Mr. Goldsmith that he felt rushed.  *Id.* at 24:18-21.  He left
with the understanding that Mr. Goldsmith was going to try to get the expiration date pushed back,
but when he returned from his social visit, he was told that he was going to court but that nobody
could tell him why.  *Id.* at 25:2-24.  When he was waiting in the holding cell, he asked for Mr.
Goldsmith, and Mr. Goldsmith told him that "they wanted [him] to plead now" and he couldn't get
the expiration day pushed back.  *Id.* at 26:5-13.  Mr. Gist says he did not see the plea agreement and
that Mr. Goldsmith said he would go over it in the courtroom.  *Id.* at 26:13-17.  Mr. Gist insists that
he pushed back and asked why he was being rushed and why couldn't he have more time to think
about it.  *Id.* at 26:19-14.  He testified that Mr. Goldsmith said in response that the Plea Agreement
was "wonderful" and that Mr. Goldsmith said he couldn't let Mr. Gist "leave the courtroom without
taking the plea agreement."  *Id.*  Mr. Gist also admitted that Mr. Goldsmith reviewed the Plea
Agreement with him, telling him what various paragraphs meant, specifically "the guideline ranges,
[his] category, what [he was] pleading to, about surcharges and things like that."  *Id.* at 27:1-10.
However, Mr. Gist testified that he did not recall Mr. Goldsmith explaining that the plea agreement
included an appellate waiver.

Mr. Goldsmith's version of events is significantly different.  He claims that he brought a
printed copy of the agreement to the meeting and that they "sat across the table from one another
and he "held the prison form of the plea agreement on the table down in a sideways fashion" so he
could read the agreement to [Mr. Gist] for [Mr. Gist] to review it."  *Id.* at 68:5-8.  At that meeting,
Mr. Goldsmith explained that the Government's offer met Mr. Gist's stated goals, then reviewed the
agreement "paragraph by paragraph."  *Id.* at 68:14-18.  Mr. Goldsmith testified that he specifically
reviewed the gun enhancement, "which is something that Mr. Gist had in our meetings previous to
this, told [Mr. Goldsmith] that he felt acceptable to plead guilty to."  *Id.* at 72:11-22; GX-4 at 3.  Mr.

Goldsmith insisted that he did not tell Mr. Gist he was likely to receive a sentence of 24-36 months' imprisonment nor did he make any promises as to the sentence Mr. Gist would receive, though he did discuss arguing for a sentence of less than 77 months. *Id.* at 73:24-74:12. Mr. Goldsmith testified that the meeting was an hour long, and that Mr. Gist accepted the plea deal at that meeting. *Id.* at 76:6-8; 79:12-14; 80:1-6. Mr. Goldsmith's contemporaneous notes support his account.

Mr. Gist expressed concern about how his plea would affect his brother's case. He also "wished he would be able to have a copy of the agreement to hold for a few days to review." Evidentiary Hearing Tr. 76:10-77:10. Mr. Goldsmith says that through their discussion, he was able to quell Mr. Gist's concerns by telling him that he had been in touch with Paul Gist's attorney the previous day, that the brothers were in the same position in terms of the new plea offer, "or very similarly situated," and that his brother's counsel felt confident that they were going to have Paul Gist accept a plea. *Id.* 76:10-24. Mr. Goldsmith recommended that Mr. Gist take the plea because it satisfied Mr. Gist's plea requirements, and Mr. Gist was averse to the risks of trial. Hearing Tr. 79:1-8.

After meeting with Mr. Gist, Mr. Goldsmith informed the Government that Mr. Gist was going to accept the plea offer. *Id.* at 95:11-17. Mr. Goldsmith was scheduled to leave for vacation the evening of February 16, 2018, the same day the plea agreement expired. The Court was notified that Mr. Gist intended to enter a guilty plea and scheduled Mr. Gist's plea hearing for February 15, 2018. Mr. Goldsmith testified that he met with Mr. Gist in a cell prior to the plea hearing, at about 3:00 p.m., for thirty minutes. *Id.* at 81:1-6. Mr. Goldsmith testified that he "reviewed the salient points" of the plea agreement again during that meeting, including the appeal waiver, to show Mr. Gist that the agreement was the same as the one previously discussed. *Id.* at 81:20-82:4. Mr. Goldsmith conceded that Mr. Gist had expressed to him concerns about the short time frame before the plea hearing and his desire to hold a written plea agreement for a few days. *Id.* at 82:7-15.

11

However, Mr. Goldsmith said that he addressed those concerns by explaining that the plea deal satisfied Mr. Gist's goals, and that the agreement could be revoked by the Government if he did not accept by the deadline. *Id.* Mr. Goldsmith testified that he met with Mr. Gist again at the counsel table in the courtroom, that he never told Mr. Gist he could not leave without signing the agreement, and that he never instructed Mr. Gist to lie to the Court. *Id.* at 82:16-83:1.

Mr. Goldsmith provided credible testimony during the evidentiary hearing, and recounted specific details about his courthouse meetings with Mr. Gist on the day of the plea hearing. Mr. Gist, on the other hand, provided self-serving testimony which after hearing Mr. Gist testify in open court, the Court simply does not credit. The testimony was inconsistent, and included details that were incredible, or plainly inaccurate (such as that Mr. Goldsmith told him that he would ask the Court for an extension of the deadline for acceptance of the Government's plea offer). Accordingly, the Court finds Mr. Goldsmith's version of events to be true.

### E.   Mr. Gist Pleads Guilty

On February 15, 2018, the Court held a hearing on Mr. Gist's plea. At the hearing, the Court assessed Mr. Gist's competency to enter the plea, and reviewed Mr. Gist's rights with him. *See* February 15, 2018 Hearing Tr. ("Plea Hearing Tr."), Dkt. No. 516. The Court also reviewed the maximum possible penalties associated with the crimes to which he was pleading guilty. Plea Hearing Tr. at 13:18-16:9. The Court explained to Mr. Gist that "by pleading guilty, you're exposing yourself to the possibility of receiving any combination of punishments up to the maximum that I am about to describe." *Id.* 13:22-24. Mr. Gist confirmed that he understood that fact. The Court also confirmed that the defendant understood that the sentence that would be imposed would be

decided by the Court and that it could be different from any estimate that his attorney (or anyone else) might have given him.[3]

The Court also reviewed the terms of the Plea Agreement with Mr. Gist.  Mr. Gist stated that he had reviewed the agreement with Mr. Goldsmith, that he understood the agreement, and that he had signed it.  *Id.* at 19:21-20:12.[4]  He affirmed that no one had offered him any inducements to accept the plea offer, and that no one had threatened him or forced him to plead guilty or to enter into the Plea Agreement.  *Id.* at 22:21-23:6.  As the basis for his plea, Mr. Gist stated on the record that

> Between 2014 and September 2016, I agreed with others to possess and sell marijuana. I sold marijuana in the Bronx.  At the time, I knew it was illegal to possess and sell. Also, on February 4, 2017, I assaulted [CW-1] while both of us were incarcerated at MCC.  At the time, I knew it was wrong to assault him.  I also believed that he was cooperating with the government.

*Id.* at 23:15-22.

After the plea hearing, Mr. Gist's grandfather, Robert L. Gist ("Mr. Gist Sr."), contacted Mr. Goldsmith to express his unhappiness with Mr. Gist's guilty plea.  Hearing Tr. 107:9-109:3.  Mr. Gist Sr. was angry that Mr. Goldsmith had allowed Mr. Gist to plead guilty at all, and was concerned about Mr. Gist's inability to appeal.  *Id.*  Mr. Goldsmith testified that he explained the legal benefits of the plea agreement to Mr. Gist Sr., and the risks that Mr. Gist would have faced had he proceeded to trial.  *Id.*  Mr. Goldsmith did not speak with Mr. Gist about his grandfather's call, but

---

[3] Plea Hearing Tr. 17:7-20 ("THE COURT:  Now, Mr. Gist, do you understand that if your lawyer or anyone else has attempted to predict what your sentence will be, that their prediction could be wrong?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Do you understand that the sentence ultimately imposed may be different from any estimate your attorney may have given you?  THE DEFENDANT.  Yes, your Honor.  THE COURT:  That's good.  Because no one can give you any assurance of what your sentence will be, because I am going to be imposing your sentence, and I am not going to be doing that now.  Do you understand that?  THE DEFENDANT:  Yes, your Honor.")

[4] Plea Hearing Tr. 19:21-20:11 ("THE COURT:  First, did you sign the original of the plea agreement on the last page?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Did you do that today?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  In the presence of your lawyer?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Did you read the agreement before you signed it?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Did you discuss it with your lawyer before you signed it?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Did you fully understand the agreement before you signed it?  THE DEFENDANT:  Yes, your Honor.")

testified that he was "quite confident" that Mr. Gist did not ask him to file an appeal. *Id.* at 110:17-111:23; *see also* GX-6 ("Goldsmith Aff.") ¶ 19; GX-3501-3. On the other hand, Mr. Gist insists that during their conversations, Mr. Gist Sr. asked Mr. Goldsmith to file an appeal. For the reasons described above, the Court does not credit Mr. Gist's testimony, given the clear self-interested reasons for lying. Furthermore, Mr. Gist was not a party to the conversations between his grandfather and Mr. Goldsmith. On the other hand, Mr. Goldsmith recounted specific details about his conversation with Mr. Gist Sr. and answered firmly that Mr. Gist nor anyone else instructed him to file a notice of appeal in this case. *Id.* at 84:22-85:18. A request to appeal Mr. Gist's conviction immediately following the plea, and before the entry of judgment, makes little sense. And the Court does not credit Mr. Gist's assertions regarding the content of Mr. Gist Sr.'s conversation with Mr. Goldsmith following his sentencing. The Court credits Mr. Goldsmith's version of events.

### F.    The Sentencing Hearing

The Court held Mr. Gist's sentencing hearing on May 17, 2018. Mr. Gist affirmed that he had reviewed the pre-sentence report (the "PSR") with his attorney and that he had no objections or issues to raise with the Court. May 17, 2018 Hearing Tr. ("Sentencing Hearing Tr."), Dkt. No. 589, at 5:7-18. As is customary, the PSR contained a description of the offense committed by Mr. Gist. Among the uncontested facts included in the PSR were the following:

> ROBERT GIST was a street-level seller of marijuana. He is responsible for conspiring to distribute at least 5 kilograms but less than 10 kilograms of marijuana
> . . .
> On February 4, 2017, brothers ROBERT GIST and PAUL GIST assaulted a codefendant who they suspected was cooperating with the Government, while all three men were incarcerated at the Metropolitan Correctional Center in New York, New York. One of the brothers used a blade to cut the victim, who sustained significant injuries, including a cut to his leg, a deep laceration inside his mouth, and a fractured hand.

PSR, May 18, 2018, Dkt. No. 550, at ¶¶ 47, 49.

During the sentencing hearing, the Court asked the defendant whether he had the opportunity to review the PSR and discuss it with his counsel.  Sentencing Hearing Tr. 5:7-18.  He confirmed that he had, and his counsel stated on the record in Mr. Gist's presence that the defense had no objections to the PSR.[5]  As permitted under the Plea Agreement, at sentencing, Mr. Goldsmith argued for the Court to vary downwards from the stipulated guidelines range.  Mr. Goldsmith requested a below-guidelines sentence of 60 months.  He did not challenge the Court's guidelines calculation, which was identical to those in the plea agreement and PSR.  *Id.* at 10:7-13:15.  With regard to Mr. Gist's assault of the individual at the MCC, the Government argued, and the uncontested facts in the PSR stated, that Mr. Gist had used a weapon and photographic evidence of the weapon was provided to the Court.  *See id.* 12:6-13:5; 19:1-2.  In response, Mr. Goldsmith argued that the evidence was not "consistent with a weapon having been used" in the assault at MCC.  *Id.* at 12:6-13:5.  However, Mr. Goldsmith also emphasized to the Court that he and Mr. Gist did not wish to request a *Fatico* hearing on the issue.  *Id.*  By choosing not to object to the relevant facts in the PSR, and by specifically choosing not to pursue a *Fatico* hearing, the defendant left the Court to decide the appropriate sentence based on the uncontested facts contained in the PSR.

The Court ultimately sentenced Mr. Gist to 77 months of imprisonment—a sentence at the bottom of the guidelines range that the parties had agreed was appropriate and one that fit within the scope of the appeal waiver in the Plea Agreement.  The sentence was 17 months greater than the sentence for which Mr. Goldsmith had advocated during the sentencing hearing.  After the Court

---

[5] Sentencing Hearing Tr. 5:7-6:4 ("THE COURT:  Mr. Gist, I would like to turn to you now, please.  Have you read the presentence report?  THE DEFENDANT:  Yes, your Honor.  THE COURT:  Have you discussed it with your counsel?  THE DEFENDANT:  Yes, your Honor.  THE COURT.  Thank you.  Have you had the opportunity to review with your counsel any errors in the presentence report, or any other issues with respect to the presentence report that should be addressed by the Court?  THE DEFENDANT:  Yes, your Honor. . . .  THE COURT:  . . . .  Mr. Goldsmith, do you have any objections related to the factual accuracy of the presentence report?  MR. GOLDSMITH:  No, your Honor.").

imposed the sentence, it dismissed all open counts and the underlying indictment, on the Government's motion. *Id.* at 29:2-8.

The Court signed the judgment on May 22, 2018.  Dkt. No. 559.  Mr. Gist did not file an appeal.  Mr. Gist testified that he asked Mr. Goldsmith to appeal the sentence in the courtroom after the hearing, and that Mr. Goldsmith responded "OK."  Evidentiary Hearing Tr. at 33:5-36:22. According to Mr. Gist, he did not realize Mr. Goldsmith had not filed an appeal until early 2019.  *Id.* By contrast, Mr. Goldsmith testified that Mr. Gist did not ask him to file a notice of appeal that day, or at any time thereafter.  *Id.* at 86:19-24.  After witnessing the testimony of both men, the Court credits Mr. Goldsmith—from its observation of Mr. Gist's testimony on the stand, the Court simply did not believe that he was telling the truth.  Apart from his demeanor while testifying, Mr. Gist's testimony is self-serving, and Mr. Gist testified that he was willing to lie to the Court under oath to obtain a desired goal—only in his account, he lied under oath at his plea hearing and sentencing, rather than at the evidentiary hearing held in connection with his § 2255 petition.  *Id.* at 46:31-12.

Moreover, the circumstances of Mr. Gist's plea and sentencing, are consistent with Mr. Goldsmith's account.  During the hearing on the plea agreement, the Court reviewed with Mr. Gist the sentencing guidelines range agreed upon by the parties.  He acknowledged under oath his awareness of that range, and of the terms of his appeal waiver.  Mr. Gist had acknowledged during his plea that he was aware that the sentence could vary from that of any estimate that anyone else might have given him.  The sentence that the Court imposed was at the bottom of the guidelines range of which Mr. Gist acknowledged he was aware; it was only 17 months greater than what his counsel advocated at sentencing.  It was dramatically below the sentencing guidelines ranges that Mr. Gist had rejected in the Government's prior plea offers.  The Court does not believe that immediately after receiving that sentence, while still in the courtroom, Mr. Gist asked his counsel to file an appeal.  Accordingly, the Court declines to accept Mr. Gist's version of events as true.

### G.    Mr. Gist's 2255 Petition

Mr. Gist filed his § 2255 petition *pro se* on May 29, 2019.  In his petition, he alleged that Mr. Goldsmith had provided ineffective assistance of counsel and identified the following six grounds for relief:  (1) Mr. Goldsmith failed to file a notice of appeal and after Mr. Gist told him to and that he wanted a direct appeal filed to the Second Circuit; (2) Mr. Goldsmith failed to challenge the drug amount at sentencing; (3) Mr. Goldsmith failed to challenge the 11 level enhancement under USSG 2J1.2(b)(1)(D) and (b)(2), because Mr. Gist did not know that the victim of the February 4, 2017 incident was a cooperating witness, and because he did not possess a blade during the altercation; (4) Mr. Goldsmith failed to contest the sentencing enhancement for possession of a firearm; (5) Mr. Goldsmith did not order a psychological evaluation prior to sentencing, even though it was known Mr. Gist had a history of depression; and (6) Mr. Goldsmith failed to contest the $15,000 fine imposed by the Court, given Mr. Gist's financial history.

The Government opposed the petition on December 10, 2019.  Dkt. No. 694.  In its opposition, the Government conceded that an evidentiary hearing was necessary on the first issue because the record revealed a disputed issue of fact.  *Id.* at 5.  In support of its opposition, the Government attached a declaration from Mr. Goldsmith, who averred that he did "not recall Mr. Gist asking [him] to file a Notice of Appeal at any time after the plea was entered" and that "[h]ad he done so, [Mr. Goldsmith] would have reminded him of the [appeal] waiver in his plea agreement."  Dkt. No. 694-4 ¶ 18.

On February 20, 2020, the Court appointed Victor Hou of Cleary Gottlieb to represent Mr. Gist in connection with his petition.  On August 17, 2020, Mr. Gist, now represented by counsel, replied to the Government's opposition.  Case No. 1:19-cv-5095-GHW, Dkt. No. 39.  The reply bolstered Mr. Gist's arguments regarding Mr. Goldsmith's failure to file a notice of appeal and also

argued that Mr. Goldsmith had been ineffective in advising Mr. Gist regarding the plea agreement, and thus, that Mr. Gist's plea was not knowing and voluntary.

On the same day, Mr. Gist submitted affidavits by both Mr. Gist and his grandfather, Mr. Gist Sr.  Case No. 1:19-cv-5095-GHW, Dkt. Nos. 41-42.  Mr. Gist Sr.'s declaration described a conversation with his grandson during which Mr. Gist Sr. expressed his unhappiness with Mr. Gist's decision to plead guilty.  Declaration of Robert L. Gist, Case No. 1:19-cv-5095-GHW, Dkt. No. 41 ("Gist Sr. Decl.").  After that conversation, Mr. Gist Sr. writes, he spoke with Mr. Goldsmith to express the fact that he was upset with Mr. Gist's decision to plead guilty.  According to Mr. Gist Sr., Mr. Goldsmith reassured him that the Court would "go light on [Mr. Gist] because that's what the judge had done in his other cases . . . ."  Mr. Gist Sr. asserted that after his grandson had been sentenced to 77 months, "much more than the 24-36 I had expected," he spoke with his grandson and "told him he needed to appeal . . . ."  *Id.* ¶ 6.  Mr. Gist Sr. asserted that he later called Mr. Goldsmith and that, "shocked and angry that [Mr. Gist] had been sentenced to so much time," he "asked Mr. Goldsmith what could be done to appeal the harsh sentence [Mr. Gist] received because it did not make sense to me."  *Id.* ¶ 7.  According to Mr. Gist Sr., Mr. Goldsmith said that it was out of his hands because it Mr. Gist had accepted a plea deal.  *Id.*  Mr. Goldsmith promised to get back to Mr. Gist Sr., but never did.  Mr. Gist Sr. "made numerous attempts to contact him to follow up on an appeal for [Mr. Gist], but Mr. Goldsmith never returned my calls."  *Id.* ¶ 8.

In Mr. Gist's reply, his counsel raised a new argument, asserting that that Mr. Goldsmith also provided ineffective assistance in advising Mr. Gist to accept, and later not withdraw, the plea agreement.[6]  The Court provided the Government with an opportunity to file a sur-reply with respect to the issue; it did so on November 6, 2020.  Dkt. No. 794.

---

[6] Although Mr. Gist's reply focused on the notice of appeal issue and the new argument regarding assistance in accepting the plea agreement, during the December 8, 2020 evidentiary hearing, Mr. Gist's counsel confirmed that he was not withdrawing any of his original grounds for the application.  Evidentiary Hearing 6:6-9.

The Court held an evidentiary hearing on December 8, 2020.  Mr. Gist, his attorneys, and the Government appeared in person.  Mr. Goldsmith testified remotely.  Evidentiary Hearing Tr. 3:9-16.  Although the Court had informed the parties that they should be prepared to address all grounds for relief raised by Mr. Gist, the parties stipulated on the record that the evidentiary hearing on December 8, 2020 would only address the limited issues related to Mr. Goldsmith's failure to file a notice of appeal and whether Mr. Gist's plea was knowing and voluntary.  Evidentiary Hearing 5:8-16.

The Court also inquired about the parties' positions regarding the universe of evidence that it should consider.  At first, the Government took the position that the Court "should be able to rely on all publicly filed documents on the docket, which also would include [Mr. Gist Sr.'s] affidavit," even though Mr. Gist Sr. was not called as a witness.  *Id.* 8:20-24.  However, the Government stated that the affidavit was a hearsay declaration and that if the Court did choose to consider it, based on the fact that Mr. Gist's grandfather was not available for cross-examination, it "recommended that the Court give little weight to that in light of that significant factor."  *Id.* at 9:15-22.  Mr. Gist requested that the Court rely on the declaration of his grandfather as part of the petition and the record.  *Id.* at 7:16-19.  The Court asked for the parties to submit additional briefing on whether the Court could consider the declaration of Mr. Gist Sr.  On December 14, 2020, Mr. Gist submitted his brief in support of admitting Mr. Gist Sr.'s declaration, the Government opposed the request on December 17, 2020, and Mr. Gist replied on December 21, 2020.

### H.    The Bureau of Prisons Investigation and Discovery Productions

During the December 8, 2020 evidentiary hearing, Mr. Gist's counsel also informed the Court that it had not received a response to a subpoena to the Bureau of Prisons (the "BOP") for certain records, including incident reports from the MCC and visitor logs recording Mr. Goldsmith's

meeting with Mr. Gist.  The incident reports related to the February attack that was the subject of the superseding indictment.  The Court directed the Government to work with the BOP to ensure compliance with Mr. Gist's subpoena, and the BOP eventually provided additional documents in response.  The BOP's production included an investigation report, which had not previously been produced.  The report did not mention use of a weapon during the assault, and included a statement by the investigator that the attack was motivated by "a disrespect issue," rather than the victim's status as a cooperating witness in the Government's case.  Mr. Gist's counsel maintains that the incident report about which they were inquiring was never produced.

Mr. Gist's counsel filed a supplemental motion on December 29, 2020, arguing that the Government had failed to comply with its obligations under *Brady vs. Maryland,* and that Mr. Goldsmith had provided ineffective assistance of counsel by failing to obtain the report before Mr. Gist entered into the Plea Agreement.  Dkt. Nos. 844-845.  The Government responded on January 19, 2021, and Mr. Gist replied on January 26, 2021.  Because the Government's compliance with its *Brady* obligations is now at issue, a brief recitation of the history of discovery in this case is warranted.

The Government made five discovery productions to C&M, dating from November 21, 2016 through January 10, 2018.  Decl. of Victor L. Hou, Dkt. No. 845 ("Hou Decl.") ¶¶ 3-8.  The January 10, 2018 production contained documents related to the assault on CW-1 on February 4, 2017:  (1) statements from three prison guards describing their response to the fight, their observations of the physical condition of the participants, and statements obtained from the participants; (2) medical clinical encounters of the three participants; and (3) photos of the three men and the area in which the altercation occurred.  Hou Decl. ¶ 8, Ex. E to Hou Decl.  After Mr. Goldsmith was retained, Mr. Gist informed him about the existence of an incident report that supported his explanation of the fight with CW-1.  Evidentiary Hearing Tr. at 99:16-100:5.  Mr.

Goldsmith requested that report from the Government, expecting "that if it existed, it would be in the 3500 [materials]," but he ultimately did not obtain it.  *Id.*  Mr. Goldsmith does not recall seeing that report.  *Id.* at 100:11-19.

Following Cleary Gottlieb's appointment as counsel to Mr. Gist, Mr. Hou requested additional materials from the Government, including "a copy of the SIS report, incident report, and Discipline Hearing Officer ('DHO') report relating to the assault of [CW-1]."  Hou Decl. ¶¶ 11-12. In response, the Government reproduced the materials from its January 10, 2018 production.  *Id.*; *see also id.* ¶ 15.  Mr. Hou also emailed Mr. Goldsmith to request Mr. Gist's case file, including "(1) the SIS report; (2) the incident report; (3) the DHO report; and (4) any other documentation relating to Mr. Gist's 18 U.S.C. §§ 1512(a)(2) and 2 counts."  *Id.* ¶¶ 13-14.  Mr. Gist's team also submitted a FOIA request to the U.S. Department of Justice and the BOP for the incident report, DHO report, and BOP Referral for the February 4, 2017 incident.  Id. ¶ 16.  Mr. Gist had not received a production in response to that request as of December 29, 2020. *Id.*

On November 19, 2020, the attorneys from Cleary Gottlieb spoke with counsel for the Government and again requested the materials related to the February 4, 2017 incident.  *Id.* ¶ 18. During that meeting, the counsel for the United States said that they had produced all of the SIS materials and offered to produce those documents again.  *Id.*  But they asserted they did not see how records related to the assault of CW-1 at the Metropolitan Correctional Center (the "MCC") was relevant to the evidentiary hearing believed it to be unnecessary to reach out to the MCC or the BOP for records.  *Id.* ¶ 18.  Later that day, Mr. Lawner, one of the attorneys from Cleary Gottlieb, emailed counsel for the United States and asked if they had checked in with the BOP to see if other materials existed and specified that Mr. Gist's attorneys were looking for an incident report that made findings and conclusions regarding the incident.  *Id.* ¶ 19.  In response, counsel for the United States repeated that they had produced all of the materials they had received from the BOP related

to the assault and that they did not believe the requested materials to be relevant.  *See* Ex. K. to Hou

Decl.

On November 23, 2020, Mr. Hou subpoenaed the MCC for "all SIS reports, incident

reports, and DHO reports" related to the February 4, 2017 assault, with a return date of December

7, 2020, three days before the evidentiary hearing.  Hou Decl. ¶ 21; Ex. L. to Hou Decl.  As noted

above, Mr. Gist did not receive a response to that subpoena before the date of the hearing and the

Court directed that the Government work with the BOP and the MCC to comply with Mr. Gist's

subpoena.

On December 10, 2020, the BOP produced an Inmate Investigative Report (also referred to

as the "Final Incident Report" in the parties' briefs) which contained staff documentation and

medical assessments from the assault, additional statements obtained through BOP interviews, and

conclusions and recommendations.  The report was completed by a BOP investigator on March 14,

2017, and was ultimately approved by the MCC's warden.  Ex. M to Hou Decl..  The report states

that CW-1 was interviewed by the BOP investigator on February 14, 2017.  According to the very

sparse interview notes, CW-1 identified Mr. Gist and his brother and said that they "entered his cell

to confront him about allegedly discussing their court case."  Ex. M at 3.  CW-1 stated that, after

entering his cell, Mr. Gist and his brother "began striking him in the face with closed fist punches,

due to them believing he was cooperating in the case."  *Id.*  CW-1 does not report that the Gists

used a weapon in their assault.  The Final Incident Report summarizes interviews with Mr. Gist and

his brother.  In their interviews, both Gist brothers admitted that they had attacked CW-1.  They

claimed that they had done so with "closed fist punches."  Both brothers' accounts of their

motivation to assault CW-1 were consistent, as reported in the summary interview notes.  Each of

the Gists stated that they were co-defendants of CW-1 and that CW-1 "was talking about their case

22

to other inmates in the housing unit." *Id.* Both also reported harboring "ill feelings" toward CW-1 "due to feeling disrespected." *Id.*

The report contains a section labelled "Conclusion." In it, the BOP investigator concluded that Mr. Gist and Paul Gist assaulted CW-1 "over a disrespect issue" with "closed fist punches" because of their belief that CW-1 was "discussing an ongoing case they are involved in with other inmates in the housing unit . . . ," and that Mr. Gist and Paul Gist continued to harbor ill feelings toward CW-1 due to feeling disrespected. *Id.* at 4. On the basis of its conclusion, the report recommends that the Gist brothers each "receive an incident report for Code 224—Assaulting Another Person. . . . Additionally, it is recommended that inmates Gist, Robert and Gist, Paul be returned to general population upon completion of the disciplinary process." *Id.*

In its December 10, 2020 production, the BOP also produced Mr. Gist's call log from January 30, 2018 through June 28, 2018. Ex. N to Hou Decl. On December 17, 2020, the BOP made a supplemental production containing excerpts of Mr. Gist's visitors log. Hou Decl. ¶ 28-29; Ex. O to Hou Decl.

The production of the Final Incident Report is significant because it had not been produced previously, and thus, it serves as the basis for Mr. Gist's *Brady* claim. Mr. Lawner proffers that "[p]rior to December 10, 2020 when the government produced the Investigative Report, to [Mr. Lawner's] knowledge, neither [he] nor any member of Mr. Gist's current legal team had ever seen or been aware of the Investigative Report. Nor have any of Mr. Gist's prior legal counsel indicated to [Mr. Lawner] any awareness of the Investigative Report." Lawner Decl. ¶ 5. Mr. Lawner further noted that "[o]n January 22, 2021, [Mr. Lawner] confirmed that Mr. Gist also had never seen the Investigative Report before it was produced by the government, and that the report that [Mr. Gist] testified at the December 8, 2020 hearing to having previously seen . . . was a different document altogether." *Id.*

23

On December 2, 2020, while waiting for the MCC to comply with the subpoena, Mr. Hou

received an electronic copy of an incident report for Mr. Gist's brother, Paul Gist (the "Paul Gist

Incident Report"), from Paul Gist's counsel.  *Id.* ¶ 6.  The Paul Gist Incident Report is a form titled

"INCIDENT REPORT" and dated March 29, 2017.  In the section entitled "Description of

Incident," the report states that:

> On March 29, 2017, at approximately 8:16 A.M., an SIS investigation was completed.
> The investigation determined that on February 4, 2017 inmate Gist[], Paul #78207-054
> assaulted inmate [CW-1] over a disrespect issue. Specifically, Gist, P entered inmate [CW-1's]
> cell and struck him in the face and body areas with closed fist punches.  This determination is
> based on medical documentation and inmate Gist, Paul['s] self admission that he assaulted
> inmate [CW-1].  Inmate [CW-1] sustained minor injuries to the lip and right lower leg.  Gist,
> Paul did not sustain any injuries as a result of the altercation.

Ex. P. to Lawner Decl.  No similar incident report was produced for Robert Gist.  Lawner

Decl. ¶ 10.

## III.   LEGAL STANDARD

"A prisoner in custody under sentence of a [federal court] claiming the right to be released

upon the ground that the sentence was imposed in violation of the Constitution or laws of the

United States, or that the court was without jurisdiction to impose such sentence, . . . or is otherwise

subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or

correct the sentence."  28 U.S.C. § 2255(a).  The Court "shall vacate and set the judgment aside" if

the Court finds that "there has been such a denial or infringement of the constitutional rights of the

prisoner as to render the judgment vulnerable to collateral attack."  *Id.* § 2255(b).  To respect the

finality of criminal convictions, "a collateral attack on a final judgment in a federal criminal case is

generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the

sentencing court, or an error of law or fact that constitutes a 'fundamental defect which inherently

results in a complete miscarriage of justice.'"  *United States v. Bokun*, 73 F.3d 8, 12 (2d Cir. 1995)

(quoting *Hill v. United States*, 368 U.S. 424, 428 (1962)).

24

It is well established that the Sixth Amendment to the United States Constitution guarantees criminal defendants the right to effective assistance of counsel. *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970). In *Strickland v. Washington*, the Supreme Court set forth the familiar two-part test for determining whether an attorney's representation was ineffective. 466 U.S. 668 (1984). First, the defendant must demonstrate that the representation "fell below an objective standard of reasonableness." *Id.* at 688. Second, the defendant must demonstrate that the deficient representation prejudiced the defendant. *Id.* at 694.

Under the first prong of the *Strickland* test, a defendant must show that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. The court examines the reasonableness of counsel's actions, keeping in mind that "[c]onstitutionally effective counsel embraces a 'wide range of professionally competent assistance,' and 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" *Greiner v. Wells*, 417 F.3d 305, 319 (2d Cir. 2005) (quoting *Strickland*, 466 U.S. at 690); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential.").

The prejudice component of the *Strickland* test asks whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Gueits v. Kitzpatrick*, 612 F.3d 118, 122 (2d Cir. 2010) (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. In order for a defendant to satisfy the second prong of the *Strickland* test, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding . . . . The defendant must show that there is a reasonable probability

that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 693-94.

## IV.     DISCUSSION

### A.     Mr. Gist Sr.'s Affidavit

Before turning to the merits of Mr. Gist's petition, the Court must resolve the issue of whether Mr. Gist's grandfather's affidavit should be considered by the Court.  Mr. Gist Sr. submitted a declaration in support of his grandson's petition before the Court scheduled its evidentiary hearing, but he was not called to testify at the evidentiary hearing.  At the Court's request, after the conclusion of the evidentiary hearing, the parties subsequently submitted briefing on how the Court should treat Mr. Gist Sr.'s affidavit given Mr. Gist's failure to call him to testify at the hearing.  Dkt. Nos. 836-837, 839, 840.  Mr. Gist argues that his grandfather's affidavit is admissible pursuant to the residual exception to the hearsay rule.  The Court disagrees.

The residual exception to the hearsay rule provides, in relevant part, the following:

> [A] hearsay statement is not excluded by the rule against hearsay even if the statement is not admissible under a hearsay exception in Rule 803 or 804:  [if] (1) the statement is supported by sufficient guarantees of trustworthiness – after considering the totality of circumstances under which it was made and evidence, if any, corroborating the statement; and (2) it is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807.  Rule 807 was amended in 2019 "to fix a number of problems that the courts" had encountered in its application.  *See* Fed. R. Evid. 2019 Advisory Committee Notes.  Under the rule as amended, a court "should proceed directly to a determination of whether the hearsay is supported by guarantees of trustworthiness."  *Id.*  "The amendment specifically requires the court to consider corroborating evidence in the trustworthiness enquiry."  *Id.*  Additionally, the amended "rule provides that the focus for trustworthiness is on circumstantial guarantees surrounding the making of the statement itself, as well as any independent evidence corroborating the statement." *Id.*

Rule 807(b) also imposes a notice requirement, which states that

> The statement is admissible only if the proponent gives an adverse party reasonable notice of the intent to offer the statement—including its substance and the declarant's name—so that the party has a fair opportunity to meet it. The notice must be provided in writing before the trial or hearing—or in any form during the trial or hearing if the court, for good cause, excuses a lack of earlier notice.

*Id.* "'To be admissible pursuant to the residual exception, the evidence must fulfill five requirements: trustworthiness, materiality, probative importance, the interests of justice[,] and notice.'" *United States v. Griffin*, 811 Fed. App'x. 683, 686 (2d Cir. 2020) (quoting *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)). "'Congress intended that the residual hearsay exceptions will be used very rarely, and only in exceptional circumstances.'" *Parsons,* 929 F.2d at 907; *see also Griffin*, 811 Fed. App'x. at 686 (same). In determining the trustworthiness of a piece of evidence offered under the residual exception, the Court analyzes "to what extent, it minimizes the 'four class hearsay dangers,' namely, insincerity, faulty perception, faulty memory, and faulty narration." *Jacobson v. Deutsche Bank, A.G.,* 206 F. Supp. 2d 590, 595 (S.D.N.Y. 2002), *aff'd,* 59 F. App'x. 430 (2d Cir. 2003) (quoting *Schering Corp. v. Pfizer, Inc.*, 189 F.3d 218, 232-33 (2d Cir. 1999)).

Here, Mr. Gist's attorneys did not provide the Government with notice of their intent to rely on Mr. Gist Sr.'s statements at the evidentiary hearing regarding this petition prior to the hearing; they filed Mr. Gist Sr.'s affidavit on the docket in connection with their reply to the Government's opposition on August 18, 2020—nearly three months before the Court scheduled the evidentiary hearing. Counsel did not refer to it again until the date of the hearing.

Rule 807(b) unequivocally requires that notice be provided, either in written form or another form if the Court determines good cause exists. The parties jointly wrote the Court to inform it that they only intended to call two witnesses at the hearing: Mr. Gist and Mr. Goldsmith, who would testify by remote means. *See* Dkt. No. 814. That was confirmed during the December 2, 2020 conference during which the Court and the parties discussed the logistics for the evidentiary hearing.

December 2, 2020 Conference Tr. 10:24-11:1 ("[THE COURT:]  I understand that there will be only two witnesses.  As a result, this will be relatively short.").  Indeed, as the Court noted during the evidentiary hearing, "Mr. Gist [Sr.] could have been called and could have testified [at the hearing.] There are no constraints on the parties' ability to bring live witnesses [to testify at the hearing.]" Evidentiary Hearing Tr. 9:24-10:2.

Mr. Gist's current counsel asserts that Mr. Gist Sr. was not available to testify due to medical issues.  However, had proper notice been provided, the Court and parties could have made accommodations for Mr. Gist Sr. to testify remotely, just as the parties did for Mr. Goldsmith, who also had health concerns and, as a result, testified at the hearing by videoconference.  Indeed, during the November 25, 2020 hearing, the Court highlighted the parties' opportunity to do just that:

> [the Court's] takeaway from this conference is that we should proceed with an in-person hearing on the 8th with the expectation that Mr. Gist's former counsel will appear by video.  If there are other witnesses that the parties believe should appear by video, because of particularized health concerns, please raise it with [the Court]. [The Court is] happy to consider that application to limit the number of people that need to come to court in person.

November 25, 2020 Hearing Tr. 11:23-12:6.  Although the Court specifically addressed the issue, defense counsel did not raise any concerns regarding Mr. Gist Sr.'s health with the Court, nor did they attempt to find out if accommodations could be made to afford Mr. Gist Sr. the opportunity to testify at the hearing by remote means.  The testimony of Mr. Gist Sr. was clearly pertinent to the issue to be presented during the evidentiary hearing—namely, whether Mr. Goldsmith had been asked to file a notice of appeal, or if he was aware of facts giving rise to a duty to consult about that issue.  Accordingly, there was no good cause that justified the defendant's failure to notify the Government of its intention to rely on the affidavit at the evidentiary hearing before the date of the hearing.  Therefore, the Court finds that the Government was not provided with adequate notice that Mr. Gist intended to rely on the affidavit by Mr. Gist Sr., as required by Rule 807(b).

Separately, there are significant reasons why Mr. Gist Sr.'s statements may be untrustworthy—cautioning against its consideration without providing the Government the opportunity to challenge the assertions of the declarant in court.  Mr. Gist was raised by his grandfather, and they have a "wonderful, loving, [and] caring" relationship, as described by Mr. Gist.  Evidentiary Hearing Tr. 17:6-11.  Mr. Gist Sr.'s two grandsons, Mr. Gist and his brother, are both currently incarcerated.  Mr. Gist Sr. may have made his statements out of a paternal motivation to protect his family, in coordination with Mr. Gist.  For these reasons, the Court declines to consider Mr. Gist Sr.'s statement in reviewing Mr. Gist's petition.  There are insufficient indicia of the trustworthiness of Mr. Gist Sr.'s out-of-court declaration for the Court to trust in its veracity— particularly in light of these evident motivations to skew his statements in favor of his grandson.

### B.   Government Misconduct

Mr. Gist asserts that the Government violated its obligations under *Brady v. Maryland* by failing to provide him with the Investigative Report before he entered into his plea agreement and by failing to produce the Final Incident Report at all.  Mr. Gist has also requested additional discovery and an evidentiary hearing with regard to his *Brady* claim.  Mr. Gist's plea agreement contained a waiver of his appeal rights specifically targeted to a failure by the United States to comply with its obligations under *Brady*.  The waiver is valid if Mr. Gist entered the plea agreement knowingly and voluntarily.  The Court finds that he did.  Moreover, because the Final Incident Report was not in the possession of an arm of the prosecution, the Government did not violate its *Brady* obligations in this case.

### i.   Legal Standard

A prosecutor has a duty to disclose exculpatory or impeachment evidence known to others acting on the government's behalf, whether or not the prosecutor is aware of the evidence. *Strickler,* 527 U.S. at 281.  The impact of the suppressed evidence will be considered cumulatively,

not individually.  *Kyles v. Whitley,* 514 U.S. 434, 436–37 (1995).  In *Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the United States Supreme Court held "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."   The duty to disclose evidence favorable to an accused applies even though where has been no request by the accused, *United States v. Agurs,* 427 U.S. 97, 107, and the duty includes impeachment evidence as well as exculpatory evidence.  *United States v. Bagley,* 473 U.S. 667, 676 (1985).

"'With respect to when the prosecution must make a disclosure required by *Brady . . . Brady* material must be disclosed in time for its effective use at trial or at a plea proceeding."  *United States v. Douglas*, 525 F.3d 225, 245 (2d Cir. 2008) (quoting *U.S. v Coppa*, 267 F.3d 132, 135 (2d Cir. 2001)) (emphasis in original).  "Such evidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'"  *Strickler,* 527 U.S. at 280 (1999) (quoting *Bagley,* 473 U.S. at 682).  "Suppressed impeachment evidence is material if the witness whose testimony is attacked supplied the only evidence linking the defendant(s) to the crime, or where the likely impact on the witness's credibility would have undermined a critical element of the prosecution's case."  *United States v. Diaz*, 176 F.3d 52, 108 (2d Cir. 1999) (internal quotation marks omitted).  The Government's suppression "of evidence favorable to an accused . . . violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  *Brady,* 373 U.S. at 87.  "*Brady* does not, however, require the prosecution to disclose *all* exculpatory and impeachment material; it need disclose only material that, if suppressed, would deprive the defendant of a fair trial."  *U.S. v. Coppa,* 267 F.3d at 135 (emphasis in original) (citations omitted).

Evidence is not "suppressed," however, if a defendant either knew or should have known of the essential facts permitting him to take advantage of the evidence. *See United States v. Orena,* 145 F.3d 551, 558 n. 4 (2d Cir.1998); *see also Pizzuti v. United States*, No. 02CR1237LAPHBP, 2019 WL 10371606, at *33 (S.D.N.Y. Sept. 30, 2019), *report and recommendation adopted*, 2020 WL 5505384 (S.D.N.Y. Sept. 11, 2020) ("'[E]vidence is not "suppressed" if the defendant either knew, or should have known, of the essential facts permitting him to take advantage of any exculpatory evidence.'" (quoting *Leka v. Portuondo*, 257 F.3d 89, 100 (2d Cir. 2001))); *United States v. LeRoy,* 687 F.2d 610, 618 (2d Cir. 1982). The Second Circuit has stated that "where the defendant made a specific request for particular undisclosed information," a strict standard of materiality applies. *Ostrer v. United States,* 577 F.2d 782, 786 (2d Cir. 1978), *cert. denied,* 439 U.S. 1115 (1979).

With respect to habeas petitions specifically, a "[collateral] attack on a final judgment in a criminal case is generally available under § 2255 only for a constitutional error, a lack of jurisdiction in the sentencing court, or an error of law or fact that constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Graziano v. U.S.* 83 F.3d 587, 589–90 (2d Cir. 1996). To establish constitutional error, "[t]he evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the [Government], either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene,* 527 U.S. 263, 281, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1936). Accordingly, for Mr. Gist to prevail on his *Brady* claim, he must show that (1) the Government suppressed (2) evidence in its possession favorable to the defense (3) resulting in prejudice to his defense. *Strickler,* 527 U.S. at 282; *see Banks v. Dretke*, 540 U.S. 668, 691 (2004). Prejudice means that "there is a reasonable probability that the result of the trial would have been different if the suppressed [evidence] had been disclosed to the defense." *Id.* at 289. In the context of a § 2255 motion, the movant bears the

burden of proving his or her entitlement to relief under the statute by a preponderance of the evidence. *See Triana v. U.S.,* 205 F.3d 36, 40 (2d Cir. 2000).

A prompt hearing with respect to a petition for habeas corpus is warranted "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). "It is within the district court's discretion to determine whether a hearing is warranted." *Pham v. United States,* 317 F.3d 178, 184 (2d Cir. 2003). And even where factual issues may exist, district courts are permitted to resolve such disputes through written submissions. *Id.* at 184. The Court permitted the parties to submit additional briefing and exhibits with regard to Mr. Gist's newly-asserted *Brady* claim and the related supplemental § 2255 claim. The Court has reviewed the parties' submissions and determined that an additional hearing and supplemental discovery is not necessary. Therefore, Mr. Gist's request for an additional evidentiary hearing is denied.

### ii. Application.

The Court finds that the BOP was not acting as an arm of the prosecution in connection with its prosecution of Mr. Gist. The Government's *Brady* obligations in this case did not extend to materials that it did not know about but were in the possession of the BOP. The Government has proffered that it was not aware of nor in possession of the report prior to the BOP's production. A prosecutor's duty to review files for *Brady* material extends to reviewing information in the possession, custody, or control of another agency where the Government conducts a "joint investigation" with that agency. *United States v. Carroll,* No. 19 CR 545 (CM), 2020 WL 1862446, at *9 (S.D.N.Y. Apr. 14, 2020) (citing *United States v. Rigas,* No. 02 Cr. 1236 (LBS), 2008 WL 144824, at *2 (S.D.N.Y. Jan. 15, 2008), *aff'd, United States v. Rigas,* 583 F.3d 108 (2d Cir. 2009) (holding that because there was "no joint investigation" between the Government and the SEC, the Government did not need to produce documents in the SEC's custody)).

32

Mr. Gist's counsel argues that the BOP should be considered an arm of the prosecution because the BOP and the United States Attorney's Office(s) both fall under the broad umbrella of the Department of Justice. However, that fact alone is not dispositive. *See United States v. Merlino,* 349 F.3d 144, 155 (3d Cir. 2003) ("The BOP was not part of the prosecutorial arm of the federal government as it was not at all involved in either the investigation or the prosecution of the defendants," and therefore the government did not have to turn over BOP's extensive records of telephone calls by witnesses).

In order to determine whether the BOP acted as arm of the prosecution in this case, the Court considers the factors identified by other courts in this District. "A number of factors are relevant in determining whether the prosecution conducted a 'joint investigation,' including whether the other agency: (1) participated in the prosecution's witness interviews, (2) was involved in presenting the case to the grand jury, (3) reviewed documents gathered by or shared documents with the prosecution, (4) played a role in the development of prosecutorial strategy, or (5) accompanied the prosecution to court proceedings." *United States* v. *Middendorf,* 18 Cr. 36 (JPO), 2018 WL 3956494, at *4 (S.D.N.Y. Aug. 17, 2018) (*citing United States* v. *Blaszczak,* 308 F. Supp. 3d 736, 741-42 (S.D.N.Y. 2018)). None of those factors are present here. The BOP was not a part of the prosecution team. The BOP began its own internal investigation after the attack happened on its premises. From the reports disclosed to the Court, it did so in order to determine the appropriate disciplinary response for the individuals involved—for penological purposes, not prosecutorial. The Government obtained its records from the MCC by issuing grand jury subpoenas. The Government's investigation and the BOP's investigation operated independently. BOP personnel never participated in the Government's interviews, were not involved in the grand jury presentation, and were not involved in the Government's prosecution strategy. Accordingly, the Court finds that BOP did not operate an arm of the prosecution in his criminal prosecution. Therefore, the

Government had no duty to disclose the report, of which it was unaware. *See United States v. Hutcher*, 622 F.2d 1083, 1088 (2d Cir. 1980) (rejecting "a notion of 'possession' which is so elastic as to embrace materials that the prosecution never had in its files, never inspected, and never knew about.").

### C.   Mr. Gist's Section 2255 Petition Alleging Ineffective Assistance of Counsel.

#### i.   Failure to File a Notice of Appeal

The Court finds that Mr. Goldsmith did not provide ineffective assistance because he did not file a notice of appeal.  Mr. Gist contends that Mr. Goldsmith was aware that Mr. Gist wanted to appeal his sentence because Mr. Gist specifically told him to file an appeal during the sentencing hearing, and because his grandfather made the same request.  In response, Mr. Goldsmith has asserted that he was never instructed to file a notice of appeal by either Mr. Gist or his grandfather. As explained above, the Court accepts Mr. Goldsmith's version of the facts.

"[A] lawyer who disregards a defendant's specific instructions from the defendant to file a notice of appeal acts in a manner that is professionally unreasonable.  This is so because a defendant who instructs counsel to initiate an appeal reasonably relies upon counsel to file the necessary notice. Counsel's failure to do so cannot be considered a strategic decision; filing a notice of appeal is a purely ministerial task, and the failure to file reflects inattention to the defendant's wishes." *Roe v. Flores-Ortega*, 528 U.S. 470, 477 (2000) (citing *Rodriguez v. United States*, 395 U.S. 327 (1969)).  The right to decide whether to pursue an appeal is unequivocally a right reserved for the client, not counsel. *McCoy v. Louisiana,* 138 S. Ct. 1500, 1508 (2018).  The existence of an appeal waiver in a defendant's plea agreement does not change the nature of a lawyer's obligations.  "[N]o appeal waiver serves as an absolute bar to all appellate claims . . . .  Accordingly, a defendant who signed an appeal waiver does not, in directing counsel to file a notice of appeal, necessarily undertake a quixotic or frivolous quest." *Garza v. Idaho*, 139 S. Ct. 738, 745 (2019) ("[A]ll

jurisdictions appear to treat at least some claims as unwaiveable.  Most fundamentally, courts agree that defendants retain the right to challenge whether the waiver itself is valid and enforceable—for example, on the grounds that it was unknowing or involuntary.  Consequently, while signing an appeal waiver means giving up some, many, or even most appellate claims, some claims nevertheless remain.").

Even where the defendant does not instruct counsel to file an appeal, a defendant's attorney "has a constitutionally imposed duty to consult with the defendant about an appeal when there is reason to think either (1) that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal), or (2) that this particular defendant reasonably demonstrated to counsel that he was interested in appealing.  In making this determination, courts must take into account all the information counsel knew or should have known." *Flores-Ortega*, 528 U.S. at 480 (emphasis added).  While reiterating that failure to file an appeal is not unreasonable *per se*, the Court noted that "[w]e expect that courts evaluating the reasonableness of counsel's performance using [this] inquiry will find, in the vast majority of cases, that counsel had a duty to consult with the defendant about an appeal." *Id.* at 481.  Importantly, in interpreting the holding of *Flores-Ortega*, the Second Circuit has held that "where counsel does not file a requested notice of appeal and fails to file an adequate *Anders* brief, courts may not dismiss the hypothetical appeal as frivolous on collateral review." *Campusano v. U.S.*, 442 F.3d 770, 775 (2d Cir. 2006) (Sotomayor, J.).  A court need not find that defendant's appeal "would have had merit." *Peguero v. United States*, 526 U.S. 23 (1999).

If defense counsel failed to comply with her obligation to file an appeal or to consult with her client about an appeal, a defendant can show prejudice by "demonstrat[ing] that there is a reasonable probability that, but for counsel's deficient failure to consult with him about an appeal, he would have timely appealed." *Flores-Ortega*, 528 U.S. at 484.  Where counsel's performance resulted in "the forfeiture of a proceeding itself," prejudice is presumed. *Id.* at 483-84.  As with the

first prong of this analysis, the Court emphasized that it would be "unfair" to require a defendant to demonstrate that the hypothetical appeal might have had merit—all that is required is a showing that "but for counsel's deficient conduct, he would have appealed." *Id.* at 486. Prejudice is presumed even when the defendant signed an appeal waiver as part of the plea agreement. *Garza*, 139 S. Ct. at 742 (2019).

## 1. Application

Mr. Gist and Mr. Goldsmith have presented dueling versions of the circumstances surrounding Mr. Gist's failure to appeal. Mr. Gist claims that he specifically asked Mr. Goldsmith to file an appeal in the courtroom after the sentencing hearing. Evidentiary Hearing Tr. 50:7-12. Mr. Goldsmith disputes this claim and maintains that he was never asked by anyone to file a notice of appeal. *Id.* at 85:16-18; 86:19-24. Again, the Court credits Mr. Goldsmith's version of events.

At the outset, the Court must address Mr. Goldsmith's statement that he did not believe Mr. Gist had a valid basis for appeal because his plea agreement included an appeal waiver and the sentence imposed by the Court was reasonable. *See* Goldsmith Decl. ¶ 25; Evidentiary Hearing Tr. 87:3-12. This belief, on its own, would not have relieved Mr. Goldsmith of the obligation to file a notice of appeal if Mr. Gist had asked him to do so, as "filing such a notice is a purely ministerial task that imposes no great burden on counsel." *Garza,* 139 S. Ct. at 738 (citing *Flores-Ortega*, 528 U.S. at 474). Nor would his knowledge of the appeal waiver excuse counsel's obligation to consult with his client about an appeal if the circumstances warranted such a conversation. The Supreme Court has made it clear that an appeal waiver does not close the door to all appellate claims, and that the decision to appeal ultimately rests with the defendant. *Garza,* 139 S. Ct. at 745.

The Court does not credit Mr. Gist's testimony that he specifically directed Mr. Goldsmith to file a notice of appeal in the courtroom after the sentencing hearing. Mr. Gist provided no corroborating facts to support those assertions and Mr. Goldsmith denies under oath that he ever

received such a request.  Conclusory statements such as Mr. Gist's, "without detail or supporting documentation, have been found inadequate to support a claim of ineffective assistance in the face of a credible and contradictory affidavit by counsel." *United States v. Rosario*, No. 13 CR 514 NRB, 2015 WL 4629453, at *6 (S.D.N.Y. Aug. 4, 2015) *(citing Garcia v. United States*, No. 01-CR-945, 2008 WL 683661, at *5 (S.D.N.Y. Mar. 14, 2008), *report and recommendation adopted*, No. 04-CV-6020 (RMB) (GWG), 2008 WL 2446840 (S.D.N.Y. June 17, 2008) (rejecting petition where petitioner "said only in the most conclusory terms that he instructed his counsel to file a notice of appeal," without "detail[ing] the content or nature of such conversations" or "provid[ing] any contemporaneous documents making the request or documents after the deadline for filing an appeal that reflect his complaints about [counsel's] failure to file the notice")).  So too here.

Mr. Gist was not a credible witness.  He has testified that he is willing to lie to the Court under oath—he claims that he lied to the Court under oath to obtain the benefits offered under the plea agreement.  Evidentiary Hearing Tr. 51:21-52:1-9.  As described below, the Court credits Mr. Gist's testimony during his plea and sentencing proceedings over his self-serving testimony in connection with this petition.  It is indisputable that Mr. Gist lied under oath to the Court sometime—the Court believes that happened on the stand at the hearing for this habeas petition.

In contrast, Mr. Goldsmith was a credible witness during the evidentiary hearing.  He is an experienced defense attorney who had notes to corroborate his testimony regarding his meetings with Mr. Gist.  The Court will credit Mr. Goldsmith's testimony and declines to accept Mr. Gist's self-serving allegations.  *See Garcia v. United States*, No. 04-cv-6020, 2008 WL 683661, at *5 (S.D.N.Y Mar. 14, 2008) (declining to credit the petitioner's claims, where the petitioner relied "solely on his own highly self-serving and improbable assertions" and the petitioner's counsel gave a "detailed description of events [that] was eminently credible") (quoting *Chang*, 250 F.3d at 86), *report and recommendation adopted*, 2008 WL 2446840 (S.D.N.Y. June 17, 2008).

The circumstances leading up to Mr. Gist's plea and sentencing undermine the credibility of his testimony:  the sentence that he received was within the guidelines range agreed to by him, and was substantially below that offered to him in prior plea deals by the Government.  These facts are pertinent to the Court's assessment of the credibility of Mr. Gist's account—and to an evaluation of whether Mr. Goldsmith had an obligation to consult with Mr. Gist about the prospect of an appeal. During the December 8, 2020 evidentiary hearing, Mr. Gist acknowledged that he was aware that by accepting the plea agreement, he waived his right to appeal his sentence, supporting Mr. Goldsmith's version of events.  During the hearing, the parties engaged in the following exchange:

> The Government:  And as part of that plea agreement you gave up your right any sentence at or below 77 to 96 months' imprisonment, isn't that correct?
> Mr. Gist: Yes.  **After I read it word for word and had more time to look over it, yes**.
> The Government:  At the time of your change of plea hearing, you told the Court that you understood that as part of the plea agreement you gave up your right to appeal any sentence at or below 77 to 96 months' imprisonment, isn't that true?
> Mr. Gist:  Yes.

Evidentiary Hearing Tr. 47:25-48:9 (emphasis added).

Mr. Gist claims that the first and last time he spoke with Mr. Goldsmith after the sentencing was in September of 2018, when he informed Mr. Goldsmith that he was interested in filing a 2255 petition but that they did not discuss the appeal during that conversation.  Evidentiary Hearing Tr. 34:3-14, 20-22.  Even assuming that Mr. Goldsmith and Mr. Gist did discuss a potential 2255 petition in September of 2018, the Court finds it unlikely that a direct appeal would not have also been discussed in the same conversation.  Though a habeas petition under Section 2255 may be filed simultaneously with a direct appeal, a "collateral attack is not a substitute for direct appeal and petitioners are therefore generally required to exhaust direct appeal before bringing a petition [pursuant to] § 2255."  *United States v. Vilar*, 645 F.3d 543, 548 (2d Cir. 2011) (quoting *United States v. Dukes*, 727 F.2d 34, 41 (2d Cir. 1984)).  Mr. Goldsmith has 18 years of experience in criminal defense and should have been well-aware of this principle.  Mr. Gist also contends that he did not

realize Mr. Goldsmith had not filed his appeal until early 2019 because he never "heard anything back from [Mr. Goldsmith] or the courts." Evidentiary Hearing Tr. 34:15-19. Mr. Gist testified, however, that he had previously used email to contact Mr. Goldsmith and his previous attorneys. Yet Mr. Gist does not assert that he ever reached out to Mr. Goldsmith regarding his direct appeal by email, only that he made the request once during the courtroom at sentencing. *Id.* 50:7-15; 57:22-53:1-2. The Court does not believe that Mr. Gist asked Mr. Goldsmith to file a notice of appeal.

Because the Court credits Mr. Goldsmith's testimony that Mr. Gist never directly asked him to file a notice of appeal, the Court next turns to the issue of whether Mr. Goldsmith had a constitutional duty to consult with Mr. Gist about filing an appeal. This inquiry is highly fact-specific, and after considering all of the information counsel knew or should have known, the Court does not find that Mr. Goldsmith had "reason to think either [ ] that a rational defendant would want to appeal (for example, because there are nonfrivolous grounds for appeal)" or that Mr. Gist "reasonably demonstrated to counsel that he was interested in appealing." *Flores-Ortega*, 528 U.S. at 480, 486. Though "not determinative," the Supreme Court has instructed that "a highly relevant factor in this inquiry will be whether the conviction follows a trial or a guilty plea, both because a guilty plea reduces the scope of potentially appealable issues and because such a plea may indicate that the defendant seeks an end to judicial proceedings." *Id.* at 480. Even in cases where the defendant pleads guilty, as here, "the court must consider such factors as whether the defendant received the sentence bargained for as part of the plea and whether the plea expressly reserved or waived some or all appeal rights." *Id.*

Here, Mr. Gist was convicted after entering a guilty plea. During the plea hearing, the Court reviewed the terms of the agreement with Mr. Gist, and specifically noted that Mr. Gist "agreed not to file a direct appeal or to bring a collateral challenge, including an application under Title 28 U.S.C., Sections 2255 or 2241, or to seek a sentence modification, pursuant to Title 18 U.S.C.,

Section 3582(c), of any sentence at or below the stipulated guidelines range of 77 to 96 months' imprisonment." Plea Hearing Tr. 21:11-19. Mr. Gist confirmed under oath that he had read and understood the agreement, and specifically that he understood the appeal waiver. *Id.* at 20:3-12, 22:11-14. Furthermore, Mr. Gist received the sentence he bargained for. The plea agreement anticipated a sentencing range of 77 to 96 months' imprisonment, and Mr. Gist received the minimum sentence contained in that range. Plea Agreement at 4; Sentencing Tr. 24:20-24. Mr. Goldsmith was aware that Mr. Gist had received a sentence within the stipulated guidelines range. He believed that sentence to be reasonable.

The plea agreement also provided that the Government could prosecute Mr. Gist for any count dismissed at sentencing if his conviction under the agreement was later vacated. Plea Agreement at 6-7. If Mr. Gist was prosecuted for all of the counts in his indictments, he would have faced a mandatory minimum sentence of 15 years. Thus, a successful appeal would have led to the vacatur of the favorable, bargained-for sentence he received and would have exposed Mr. Gist to a more severe statutory minimum penalty—the consequence that he sought to avoid throughout his plea negotiations with the United States with C&M and Mr. Goldsmith. These facts too were known to Mr. Goldsmith, and made his decision not to consult further with his client about an appeal following sentencing reasonable.

Mr. Goldsmith did not have reason to think that Mr. Gist had demonstrated to counsel that he was interested in appealing. Gist relies heavily on the allegation that he discussed his desire to appeal with his grandfather, who he claims communicated that message to Mr. Goldsmith. Evidentiary Hearing Tr. 53:1-15. However, Mr. Goldsmith maintains that neither Mr. Gist's grandfather, nor anyone else, ever directed him to file a notice of appeal. Evidentiary Hearing Tr. 85:11-17. Again, the Court credits Mr. Goldsmith's testimony that Mr. Gist Sr. did not ask him to file an appeal on behalf of his grandson. While Mr. Goldsmith admits that he spoke with Mr. Gist

Sr. twice after the plea hearing, and that Mr. Gist Sr. was upset about the guilty plea and the appeal waiver, he testified that he believed Mr. Gist Sr.'s concerns were assuaged after Mr. Goldsmith explained the benefits of accepting the plea over proceeding to trial "simply for the opportunity to take a swing." Evidentiary Hearing Tr. 84:17-85:10; 108:20-109:5. The Court again credits that testimony. Mr. Goldsmith's knowledge that Mr. Gist Sr. was unhappy with his grandson's plea deal and its result was not sufficient to give rise to an obligation to further consult with his client about an appeal. Simply put, Mr. Gist Sr. is not Mr. Gist. Mr. Goldsmith engaged in extensive discussions with Mr. Gist about his desires for a plea deal with the Government and the terms of his eventual deal. Mr. Goldsmith knew the type of sentence that Mr. Gist was willing to accept as a result of his plea. Mr. Goldsmith knew that the sentence imposed by the Court fell within the parameters that Mr. Gist was willing to accept. That Mr. Gist Sr. had a difference of opinion with what Mr. Goldsmith knew to be the position of his grandson did not give rise to an obligation on the part of Mr. Goldsmith to consult further with Mr. Gist. Mr. Gist was an adult who Mr. Goldsmith knew to have accepted the terms of a negotiated plea deal. That a family member disagreed with Mr. Gist's decision, and the resulting sentence, did not by itself give rise to an obligation on the part of Mr. Goldsmith to consult further with his client about the possibility of an appeal. Mr. Gist's grandfather's dissatisfaction with his grandson's plea and sentence did not give Mr. Goldsmith reason to think that Mr. Gist was interested in appealing.

Under these circumstances, the Court concludes that Mr. Goldsmith did not have reason to think that a rational defendant in Mr. Gist's situation would have wanted to appeal. *See, e.g., King v. U.S.*, No. 10-CR-122 (JGK), 2017 WL 1483337, at *19 (S.D.N.Y. Apr. 25, 2017) ("An appeal could have only successfully challenged the agreement to plead guilty, and if successful, resulted in the vacatur of a favorable, below Guidelines sentence, while exposing the petitioner to the far greater liability that she avoided by pleading guilty."); *Pena-Rosario v. United States*, No. 07 CIV. 1830 (DLC),

2008 WL 754289, at *2 (S.D.N.Y. Mar. 20, 2008) (finding that the petitioner's inability to identify "non-frivolous issues that would have warranted an appeal . . . [was] unsurprising because his conviction rested on a plea of guilty and he was sentenced at the bottom of the guidelines range to which he had stipulated in his plea agreement" (citation omitted)). As Mr. Gist himself has stated, he agreed to take the plea because he was interested in its significant benefits. Evidentiary Hearing Tr. 52-8-10. The sentence fell within the sentencing guidelines range agreed to by Mr. Gist in the context of a plea deal that satisfied all of his conditions for such a deal. A sentence of 77 months— at the bottom of the guidelines range agreed to by Mr. Gist—was not something that a rational defendant with Mr. Gist's criminal history, and who had accepted responsibility for attacking a cooperator with a blade, would have wanted to appeal. Especially because a successful appeal would have resulted in substantial additional exposure.

Mr. Gist also contends that Mr. Goldsmith should have known that he was interested in an appeal of his sentence because Mr. Gist alerted him to the BOP report supporting Mr. Gist's version of the assault. But this was not new information. Mr. Gist and Mr. Goldsmith knew that the BOP report existed during negotiations with the Government and at the time Mr. Gist signed his plea agreement. Furthermore, the appeal waiver in the agreement specifically covered appeals based on the Government's failure to produce any discovery material, including *Brady* and *Giglio* violations. *See* Plea Agreement at 6. Thus, weighing the information available to Mr. Goldsmith, the Court concludes that his failure to consult with Mr. Gist about the possibility of appeal was not a constitutionally deficient performance. A rational defendant would not want to appeal his bargained-for sentence where a successful appeal would result in a longer sentence, and Mr. Gist has not shown that Mr. Goldsmith should have known he was interested in pursuing an appeal of his sentence or otherwise been obliged to consult specifically with him about the issue following his

sentencing.  Thus, Mr. Gist has failed to meet his burden of establishing ineffective assistance of counsel as to this claim.

### ii. Failure to Investigate and Challenge PSR Findings and Sentencing Enhancements.

Mr. Gist asserts that Mr. Goldsmith provided ineffective assistance of counsel because Mr. Gist had informed Mr. Goldsmith about the existence of the Final Incident Report and Mr. Goldsmith failed to investigate and to ensure that the Government complied with its *Brady* obligations.  He also argues that Mr. Goldsmith's failure to investigate impacted Mr. Gist's ability to use the Final Incident Report to challenge the Court's sentencing enhancements related to the § 1512 count, which were based on the facts stated in the PSR.

The duty to investigate requires counsel "to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *Strickland*, 466 U.S. at 691.  Where there is "reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable." *Id.*  Defense counsel's duty to investigate does not compel him "to investigate comprehensively every lead or possible defense[.]" *Greiner v. Wells*, 417 F.3d 305, 321 (2d Cir. 2005) (internal quotation marks and citations omitted); *accord Wiggins v. Smith*, 539 U.S. 510, 527 (2003) ("'[A] court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further.").  Mr. Gist must also demonstrate that, "but for the alleged deficiency on the part of his counsel, there is a reasonable probability that the outcome of [Mr. Gist's] proceedings would have been different." *Id.*

At the outset, Mr. Gist expressly "waive[d] any and all right . . . to attack his conviction, either on direct appeal or collaterally, on the ground that the [g]overnment ha[d] failed to produce . . . exculpatory material pursuant to *Brady* . . . other than information establishing [his] factual innocence." GX-4.  "Such waivers are enforceable where . . . the defendant entered into

the plea agreement knowingly and voluntarily." *Tremblay v. United States*, No. 05-cr-0783 (JFK), 2009 WL 1055007, at *8 (S.D.N.Y. Apr. 20, 2009). For the reasons discussed below, the Court finds that Mr. Gist entered his plea agreement knowingly and voluntarily and thus, that the waiver is enforceable.

The issue is whether the report falls within the waiver's carveout for "information establishing [Mr. Gist's] innocence." GX-4. The Court finds that the incident report does not "establish" Mr. Gist's innocence. Two principal facts from the report might support Mr. Gist's position—but neither establishes his innocence. First, the report says that the Gists attacked CW-1 with closed fists, rather than a blade. If it were true that Mr. Gist attacked the cooperating witness with closed fists, rather than a blade, he would not be innocent of the crime. Moreover, there is substantial evidence that supports the statement made by Mr. Gist under oath at the plea hearing, and the fact accepted as true by Mr. Gist in the PSR, namely, that a weapon was used. Second, the investigator stated in his conclusion that the fight was instigated because of a disrespect issue. Mr. Gist would argue that the fact that the investigator stated that to have been the reason for the attack shows that he did not attack the witness because he was a cooperator. But the BOP investigator's conclusion does not prove Mr. Gist's innocence. Read in the light most favorable to Mr. Gist, the investigator credited his and his brother's testimony over that of CW-1. But a single investigator's credibility assessment of CW-1 does not establish that Mr. Gist was innocent.[7] Accordingly, Mr. Gist is procedurally barred from challenging his conviction on this basis.

Moreover, Mr. Gist's application is not timely insofar as it relates to his *Brady* claim. Under § 2255(f)(1), a petition must be filed within one year of the date that the underlying conviction becomes final. Mr. Gist's *Brady* challenge fails to satisfy the statute-of-limitations exception in

---

[7] It is unclear that evidence of the investigator's conclusion regarding the credibility of the witnesses would be presented to a jury: drawing such a conclusion of fact from competing testimony would intrude upon the terrain of the finder of fact.

44

Section 2255(f)(2).  His *Brady* claim was raised more than 18 months after his initial Section 2255 petition.  *See Wong v. United States*, 537 F. Supp. 2d 436, 441 (E.D.N.Y. 2007) ("Petitioner's mere allegation that the [g]overnment has suppressed exculpatory material alone cannot possibly satisfy the exception articulated in [S]ection 2255(f)(2).  Otherwise, the exception would 'swallow the rule,' permitting virtually anyone who mentions *Brady* to file after the one-year limitations period.").  And even if Petitioner's *Brady* argument were timely and not waived, the Court would reject it on the merits because as explained above, the Government did not violate its *Brady* obligations in this case.

Mr. Gist also asserts that Mr. Goldsmith provided ineffective assistance of counsel by failing to challenge the sentencing enhancements with respect to his § 1512 count.  During sentencing, the Court applied enhancements driven by the accepted facts that Mr. Gist knew that CW-1 was a cooperator and that Mr. Gist used a weapon during the fight with CW-1.  He argues that Mr. Goldsmith should have investigated and secured production of the Final Incident Report so that he could challenge the § 1512 Count and the Pre-Sentence Report Findings.  As described above, during the sentencing hearing, neither party objected to the factual findings in the pre-sentence report, and during the plea hearing, Mr. Gist stated those facts under oath.  Therefore, the Court adopted them, and applied the enhancements agreed upon by the parties in their plea agreement.

Mr. Goldsmith admitted that he knew about the existence of the report.  He testified that Mr. Gist told him that he did not know that CW-1 was a cooperator, and that CW-1 had been telling other inmates that Mr. Gist was a cooperator.  But it was evident from his testimony that Mr. Goldsmith did not believe his client.  Mr. Goldsmith testified that he did not find any discovery to be "overly persuasive or supportive of that notion."  Evidentiary Hearing Tr. 98:6-9.  It was not unreasonable for Mr. Goldsmith to not believe his client, based on his observation that "Mr. Gist had a fairly strong understanding of who the witnesses were, information that they would likely be providing at trial, as well as points of impeachment on those individuals[,]" including CW-1.  *Id.* at

98:11-99:4.  Accordingly, the decision to advise Mr. Gist to take a favorable plea that satisfied his requirements was within the parameters of reasonable strategic decisions by counsel.  The report was not yet in the possession of Mr. Gist and his counsel, the trial was quickly approaching, and other evidence supported the application of the enhancements.  Most significantly among them was the defendant's own sworn statements during his plea allocution.  Furthermore, as Mr. Goldsmith testified, he reasonably expected that the report would be in the 3500 materials if the case had proceeded to trial, so he knew that by pleading, he was choosing not to get to that stage and instead to prioritize securing the plea, which was consistent with the parameters described to him by his client at their first meeting and offered a substantially better potential sentence than the one Mr. Gist faced if he went to trial.

     For these reasons, Mr. Gist's arguments regarding Mr. Goldsmith's alleged failure to investigate and challenge the sentencing enhancements fail.

### iii.   Knowing and Voluntary Plea

Mr. Gist further asserts that his guilty plea was not knowing, voluntary, and intelligent because Mr. Goldsmith provided ineffective assistance of counsel during his plea negotiations and hearing.  A criminal defendant's right to effective assistance of counsel includes representation during the plea-bargaining process.  *Padilla v. Kentucky*, 559 U.S. 356, 364 (2010).  Ineffective assistance of counsel during plea negotiations can invalidate a guilty plea "to the extent that the counsel's deficient performance undermines the voluntary and intelligent nature of the defendant's decision to plead guilty."  *United States v. Arteca*, 411 F.3d 315, 320 (2d Cir. 2005).  A guilty plea is valid if "the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant."  *Hill v. Lockhart*, 474 U.S. 52, 56 (1985) (quoting *North Carolina v. Alford*, 400 U.S. 25, 31 (1970)).  "A plea is considered 'intelligent if the accused had the advice of counsel and understood the consequences of his plea, even if only in a fairly rudimentary way,' and it is considered 'voluntary if it is not the product of actual or threatened physical harm, mental coercion overbearing the defendant's will, or the defendant's sheer inability to weight his options rationally.'"  *Manzullo v. New York*, No. 07-CV-744 (SJF), 2010 WL 1292302, at *5 (E.D.N.Y. Mar. 29, 2010) (quoting *Miller v. Angliker*, 848 F.2d 1312, 1320 (2d Cir. 1988)).

"Counsel has a professional obligation to adequately inform her client about the considerations that are relevant to her client's decision to accept or deny a plea bargain."  *Davis v. Greiner*, 428 F.3d 81, 88-89 (2d Cir. 2005) (holding that counsel was ineffective where he failed to advise defendant on provision that "essentially constituted a waiver of Davis's right against self-incrimination-an important constitutional protection.").  However, "[c]ounsel's conclusion as to how best to advise a client in order to avoid, on the one hand, failing to give advice and, on the other, coercing a plea enjoys a wide range of reasonableness because '[r]epresentation is an art,' *Strickland*, 466 U.S. at 693, 104 S.Ct. 2052, and '[t]here are countless ways to provide effective

assistance in any given case,' *id.* at 689, 104 S.Ct. 2052." *Purdy v. United States*, 208 F.3d 41, 45 (2d Cir. 2000). "Counsel rendering advice in this critical area may take into account, among other factors, . . . the defendant's comprehension of the various factors that will inform his plea decision." *Id.*

### i. **Application**

Mr. Gist's application is premised on a version of facts that the Court finds not to be credible. Mr. Gist alleges that Mr. Goldsmith only gave him a short amount of time to review and think about accepting the agreement, that he only discussed some of the terms of conditions of the agreement, and that he said the Court would impose a below-guidelines sentence. These assertions are unsupported by the record and Mr. Gist's statements at the plea hearing.

In assessing Mr. Gist's claim that his counsel's performance was deficient in advising him about the consequences of his plea, the Court is "entitled to rely upon the defendant's sworn statements, made in open court." *United States v. Hernandez*, 242 F.3d 110, 112 (2d Cir. 2001). "Any allegations a defendant makes in a § 2255 petition 'cannot overcome his contrary statements under oath during a plea allocution, which must be given presumptive force of truth.'" *Hsu*, 954 F. Supp. 2d at 221 (quoting *Hernandez*, 242 F.3d at 112–13). The Supreme Court has long held that "[s]olemn declarations in open court carry a strong presumption of verity. The subsequent presentation of conclusory allegations unsupported by specifics is subject to summary dismissal . . . ." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977) (citing *Machibroda v. United States*, 368 U.S. 487, 495–96 (1962)). The Second Circuit has thus made clear that testimony in a plea allocution "carries a strong presumption of accuracy" and district courts do not, "absent a substantial reason to find otherwise, abuse [their] discretion in discrediting later self-serving and contradictory testimony as to whether a plea was knowingly and intelligently made" or rejected. *United States v. Juncal*, 245 F.3d 166, 171 (2d Cir. 2001); *see also Mejia v. United States*, 740 F. Supp. 2d 426 (S.D.N.Y. 2010) ("A defendant's bare

allegations in a 2255 petition cannot overcome his contrary statements under oath during a plea

allocution . . . ."); *Hernandez*, 242 F.3d 110, 114 (2d Cir. 2001) (holding that "petitioner] fails on the

merits [of his § 2255 claim] because his factual assertions regarding his counsel's alleged

ineffectiveness simply contradict his sworn statements at the plea allocution.").

During the plea hearing, the Court engaged in the following colloquy with Mr. Gist:

THE COURT:  Did you read the agreement before you signed it?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  Did you discuss it with your lawyer before you signed it?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  Did you fully understand the agreement before you signed it?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  Thank you.  Now, one of the features of your agreement with the government is that you have agreed upon the advisory guidelines range that applies in this case. Is that correct?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  You should know that agreement is binding on you and it's binding on the government, but it's not binding on me. As I said earlier, I have my own independent obligation to calculate the advisory sentencing guidelines range in this case and then what the appropriate sentence is.  And I am not saying that I am going to come up with anything that is different from what is contained in your plea agreement, but you need to understand that even if I do determine that the advisory sentencing guidelines range is different from what is contained in your plea agreement, even if I decide that it's higher than the one that you have agreed to with the government, I will not let you withdraw your plea.  Do you understand that?
THE DEFENDANT: Yes, your Honor.
. . .
[THE COURT]:  [After reading the appeal waiver provision of the Plea Agreement.] Mr. Gist, do you understand the rights to appeal or attack your conviction and sentence that you have waived in your plea agreement?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  Now, Mr. Gist, does this written plea agreement constitute your complete and total understanding of the entire agreement between you and the United States?
THE DEFENDANT:  Yes, your Honor.
THE COURT:  Has anything been left out?
THE DEFENDANT:  No, your Honor.
THE COURT:  Mr. Gist, other than what is written in this agreement, has anyone made any promise to you or offered you any inducement to plead guilty or to sign the plea agreement?
THE DEFENDANT:  No, your Honor.
THE COURT:  Has anyone threatened you or forced you to plead guilty or to sign the plea agreement?
THE DEFENDANT:  No, your Honor.

> THE COURT:  Has anyone made a promise to you about what your sentence will be?
> THE DEFENDANT:  No, your Honor.

Plea Hearing Tr. 20:3-21:5; 22:11-23:8.  As the basis for his plea, Mr. Gist informed the Court

that

> Between 2014 and September 2016, I agreed with others to possess and sell marijuana.
> I sold marijuana in the Bronx. At the time, I knew it was illegal to possess and sell.
> Also, on February 4, 2017, I assaulted [CW-1] while both of us were incarcerated at
> MCC. At the time, I knew it was wrong to assault him. I also believed that he was
> cooperating with the government.

*Id.* at 23:15-22.

During the plea hearing, the Court also explained the maximum possible for the offenses to

which he was pleading guilty, and reminded him that even as Mr. Gist prepared to enter his guilty

plea, he had the option of pleading not guilty.  *Id.* at 9:11-16; 13:18-16:17.  Mr. Gist confirmed that

he understood.  *Id.*  Furthermore, the Court specifically advised Mr. Gist that he should notify the

Court if he wanted more time to confer with Mr. Goldsmith before entering his plea:

> [THE COURT]:  Now, Mr. Gist, before I accept your guilty plea, I am going to ask
> you certain questions so that I can establish to my satisfaction that you wish to plead
> guilty because you are in fact guilty and not for some other reason. I also want to make
> sure that you understand what it is that you will be giving up if you choose to proceed
> and enter a guilty plea in this case.  So if you don't understand any of my questions, or
> if you wish to consult with your lawyer at any time and for any reason during this
> conference, please don't hesitate to let me know. I'd be happy to give you as much
> time as you like to confer with your counsel, and I will be happy to clarify any of my
> questions if it would be helpful for you.
> THE DEFENDANT: Yes, your Honor.

*Id.* at 2:22-3:10.  Although he confirmed that he understood that the Court would afford him

additional time, Mr. Gist made no such request.

Mr. Gist's "in-court statements are afforded a 'strong presumption of verity,'" *Delutro v.*

*United States*, No. 11-CV-2755 CBA, 2014 WL 4639198, at *8 (E.D.N.Y. Sept. 16, 2014)

(quoting *Gonzalez*, 722 F.3d at 130–31), "and create a 'formidable barrier' to habeas

relief," *id.* (quoting *Blackledge*, 431 U.S. at 74).  Mr. Gist's "claims of coercion fail because even if this

Court accepted his allegations regarding [counsel]'s conduct as true, his in-court statements conclusively indicate that the alleged conduct did not result in a coerced plea." *See Adames v. United States*, 171 F.3d 728, 732 (2d Cir. 1999) ("A criminal defendant's self-inculpatory statements made under oath at his plea allocution 'carry a strong presumption of verity,' and are generally treated as conclusive in the face of the defendant's later attempt to contradict them[.]'") (internal quotation and citation omitted).

Mr. Gist's assertions in his petition and at the evidentiary hearing on December 8, 2020 are wholly inconsistent with his statements during the plea allocution. Both sets of statements were made under oath. But only one of Mr. Gist's versions of events can be true. The Court accepts Mr. Gist's statements at the plea allocution as the truth, notwithstanding Mr. Gist's recent assertion that he lied to the Court while under oath at the plea hearing. The Court has the choice of picking which set of statements made to it under oath were false: in light of its observations of Mr. Gist in both contexts, and cognizant of the self-serving and flawed nature of his recent testimony, the Court finds that Mr. Gist's statements at the evidentiary hearing were not truthful. Furthermore, Mr. Gist had a clear opportunity during his plea allocution to address the issues of which he now complains. But in his plea colloquy with the Court, he denied that they occurred. Therefore, the Court affords no weight to Mr. Gist's new version of events. Moreover, the fact that Mr. Gist waited roughly nine months before seeking to vacate his sentence "severely undercuts [his] argument that [ ]he pleaded guilty involuntarily." *United States v. Doe,* 537 F.3d 204, 213 (2d Cir. 2008) ("[T]he fact that the defendant waited five months to file his motion [to withdraw] strongly supports the district court's finding that his plea was entered voluntarily.").

"A defendant's lack of experience and knowledge of his rights are relevant to determine whether counsel's performance fell below a standard of reasonableness," including whether the defendant "was [ ] otherwise informed, by law enforcement or previous experience," of key portions

of the agreement.  *Davis*, 428 F.3d at 89.  Here, in connection with his previous plea offers, Mr. Gist

was advised by his prior attorneys on the effect of the appeal waivers contained those offers, the

language of which were identical to the provision in the agreement he ultimately entered with Mr.

Goldsmith, as well as the potential sentence he faced at trial, and that only the Court could

determine his sentence.  GX-8 at ¶¶ 3-4, 7, 9.  Mr. Goldsmith was aware that Mr. Gist had

familiarity with the plea process, and that prior counsel had reviewed the Government's prior offers

with Mr. Gist.  Evidentiary Hearing Tr. 72:23-73:8.[8]  Both Mr. Gist and Mr. Goldsmith have

testified that they met twice to discuss the offer prior to the plea hearing.  Mr. Goldsmith

acknowledges that Mr. Gist was apprehensive about the timing of the plea deadline and that Mr.

Gist wanted to review a hard copy before entering the agreement, but that those concerns were

resolved during their discussions.  Evidentiary Hearing Tr. 77:17-78:1.  Mr. Goldsmith credibly

testified that he walked through the Government's plea offer paragraph by paragraph with Mr. Gist.

Evidentiary Hearing Tr.  68:12-18; 102:8-14.  Based on the evidence presented by the parties, the

Court cannot conclude that Mr. Goldsmith's actions were unreasonable.

Mr. Gist contends that Mr. Goldsmith told him that he would receive a sentence of 24 to 36

months.  *Id.* at 48:13-17.  Mr. Goldsmith contests the accuracy of that assertion, and states that he

never told Mr. Gist he was likely to receive such a short sentence.  *Id.* at 72:24-73:3.  Furthermore,

Mr. Goldsmith specifically noted that "[t]here are certainly discussions that I had with [Mr. Gist]

about arguing for less than the 77 months.  The notion of 24 to 36 months doesn't add up to the

charges under this plea agreement."  *Id.* at 73:4-7.  Again, the Court credits Mr. Goldsmith.  It is

implausible that counsel promised Mr. Gist a sentence in the range described by Mr. Gist—as Mr.

Goldsmith testified, a 24 to 36 month sentence doesn't add up in the context of a plea involving

---

[8] In addition, the Plea Agreement laid out Mr. Gist's six prior criminal convictions as part of the parties' agreed-upon sentencing guidelines calculation.  GX-4 at 3-4.  Mr. Goldsmith was aware that Mr. Gist had familiarity with the plea process from his prior criminal cases in state court.

both narcotics and a violent attack on a cooperating witness by a defendant with a criminal history category of V.  The Court does not believe that Mr. Goldsmith promised such a sentence.

In any event, "[e]rrors in counsel's predictions of a defendant's ultimate sentence under the United States Sentencing Guidelines generally do not constitute ineffective assistance of counsel because such predictions are, by nature, only guesses or estimates." *Hsu*, 954 F. Supp. 2d at 221 (S.D.N.Y. 2013) (citing *United States v. Sweeney,* 878 F.2d 68, 70 (2d Cir. 1989)).  Where a defendant is arguing that "counsel has misled him as to the possible sentence which might result from a plea of guilty, the issue is whether the defendant was aware of actual sentencing possibilities." *United States v. Arteca,* 411 F.3d 315, 320 (2d Cir.2005) (*quoting Ventura v. Meachum,* 957 F.2d 1048, 1058 (2d Cir. 1992)).  Furthermore, the terms of the plea agreement specifically stated that the Government could not determine what sentence Mr. Gist would receive and that the Court was not bound by the sentencing guidelines range set forth in the agreement, and Mr. Gist was reminded of those facts at the plea hearing.  As described above, the Court specifically asked Mr. Gist whether he understood the advisory sentencing guidelines and how they might apply to Mr. Gist's case, and Mr. Gist said under oath that he did.  The Court also specifically advised Mr. Gist of the maximum possible penalties of the offenses to which he was pleading guilty.  Plea Hearing, 13:18-17:20.  Accordingly, because Mr. Gist's argument is unsubstantiated by the record, the Court finds that it is without merit.

Turning to the second prong, even assuming that Mr. Goldsmith's advice regarding the plea offer was constitutionally deficient, Mr. Gist has not met his burden to demonstrate prejudice.  Mr. Gist must show that "there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hernandez,* 242 F.3d 110, 112 (2d Cir. 2001) (quoting *Hill v. Lockhart*, 474 U.S. 52, 57-58 (1985)).  As explained above, Mr. Gist was specifically informed by the Court of the consequences of his plea. *See Gonzalez v. United States,* 10

Civ. 5463, 2010 WL 3465603, at *3–4 (S.D.N.Y. Sept. 3, 2010) (assuming that counsel did not advise defendant that he could be deported as a result of his guilty plea, defendant not prejudiced because the court advised him of the consequences prior to accepting his plea); *Wang v. United States*, No. 10 CIV 4425 BMC, 2011 WL 73327, at *5 (E.D.N.Y. Jan. 10, 2011), *aff'd sub nom. Jian Wang v. United States*, 458 F. App'x 44 (2d Cir. 2012) ("[E]ven if his trial counsel did not apprise him of his basic rights and the risks in pleading guilty, Wang cannot prove prejudice because he was so informed by this Court at the plea hearing.").

Mr. Gist received significant benefits from pleading guilty. Most significantly, Mr. Gist was not exposed to the 15-year mandatory minimum that would have applied had he proceeded to trial and been found guilty. Among other benefits, the plea agreement provided that if he demonstrated acceptance of responsibility for his crime, he warranted a three-level reduction in his Sentencing Guidelines offense level. Mr. Gist's purported mistaken belief about the potential of receiving a below-guidelines sentence is not enough to demonstrate "the kind of prejudice necessary to satisfy the second half of the *Strickland v. Washington* test." *Hill*, 474 U.S. at 60; *see also Maher,* 108 F.3d at 1529 ("The fact that a defendant has a change of heart prompted by his reevaluation of . . . the penalty that might be imposed is not a sufficient reason to permit withdrawal of a plea.") (quoting *United States v. Gonzalez,* 970 F.2d 1095, 1100 (2d Cir.1992)). Furthermore, whether Mr. Goldsmith advised Mr. Gist as to the effect of the *Brady/Giglio* waiver has little effect. Even if Mr. Gist had the Investigative Report in his possession prior to accepting his plea agreement, he still would have faced the threat of a much longer sentence and a mandatory minimum of 15 years and a potential lifetime sentence, had he proceeded to trial on his other charges. Therefore, given the "substantial benefit resulting from his guilty plea, the petitioner has failed to demonstrate that he was prejudiced by his counsel's advice to plead guilty." *Marston v. United States*, No. 17-CR-298 (JGK), 2020 WL 6701014, at *5 (S.D.N.Y. Nov. 13, 2020); *see also Muniz v. United States*, 360 F. Supp.

2d 574, 579–80 (S.D.N.Y. 2005); *Paddyfote v. Artus*, No. 14CIV6280VBJCM, 2017 WL 4685274, at *9

(S.D.N.Y. Aug. 2, 2017) (collecting cases), *report and recommendation adopted*, No. 14 CV 6280 (VB),

2017 WL 4685106 (S.D.N.Y. Oct. 17, 2017).

### B.   Additional Claims for Relief

In addition to the grounds for relief listed above, Mr. Gist raised four additional arguments

in his *pro se* petition.  He alleged that Mr. Goldsmith provided ineffective assistance by failing

challenge the drug quantity and gun enhancements for Mr. Gist's guidelines calculations at

sentencing, contest the $15,000 minimum fine imposed by the Court, given Mr. Gist's financial

history, and order a psychological evaluation prior to sentencing, though Mr. Gist's history of

depression was known.  These arguments were not addressed in Mr. Gist's reply brief, but his

counsel informed the Court at the December 8, 2020 evidentiary hearing that Mr. Gist had not

waived these arguments.  Because Mr. Gist filed his petition *pro se* the Court must construe it

"liberally to raise the strongest arguments it suggests."  *Nielsen v. Rabin*, 746 F.3d 58, 63 (2d Cir.

2014) (quoting *Walker v. Schult*, 717 F.3d 119, 124 (2d Cir. 2013)); *see also Erickson v. Pardus*, 551 U.S.

89, 94 (2007) ("A document filed *pro se* is 'to be liberally construed'") (quotation omitted); *Green v.*

*United States*, 260 F.3d 78, 83 (2d Cir. 2001) (holding that the general rule that *pro se* plaintiffs "are

entitled to a liberal construction of their pleadings" applies to motions filed pursuant to Section

2255); *Haines v. Kerner,* 404 U.S. 519, 520 (1972) (per curiam) (holding that the allegations in a *pro*

*se* complaint are "h[e]ld to less stringent standards than formal pleadings drafted by lawyers").  But,

even after reading petitioner's motion with a lenient eye, as required, the Court has determined that

these claims are without merit.

### i.   Failure to Challenge Drug Amount at Sentencing

Mr. Gist argues that Mr. Goldsmith should have challenged the Court's finding that he was

personally responsible for 10-12 kilograms of marijuana, the entire amount of marijuana for the

conspiracy, even though he pleaded to possessing 5-10 kilograms and was only personally responsible for "8 bags." Petition at ECF p. 5. At the outset, this assertion is not supported by the record. During sentencing, because there were no objections from the parties regarding the factual recitations in the PSR, the Court adopted the marijuana amount described in it, consistent with the plea agreement, and stated that the sentencing calculation was based on the finding that Mr. Gist was "responsible for the sale of between 5 and 10 kilograms of marijuana in connection with the conspiracy, conduct that [the Court] believe[s] with respect to the sale of narcotics is substantially less serious than that of many of his co-conspirators." Sentencing Hearing Tr. 18:16-20; see also 7:18-20. Furthermore, the plea agreement itself also expressly stated that "the offense involved the possession of more than 5 kilograms but less than 10 kilograms of marijuana" as part of the stipulated guidelines calculation. See GX-4 at 2. Mr. Goldsmith's actions were not unreasonable. Had he pursued the line of argument that Mr. Gist advances now, that position would have been inconsistent with the terms of the Plea Agreement.

For those reasons, Mr. Gist has failed to set forth sufficient facts to support the conclusion that Mr. Goldsmith's actions were unreasonable or that he suffered any prejudice, and accordingly has failed to demonstrate that Mr. Goldsmith was ineffective on this basis.

ii.   Failure to Challenge Enhancement for Possession of Firearm

By entering the Plea Agreement, Mr. Gist agreed that, pursuant to the sentencing guidelines, the applicable offense level would be increased by two because he possessed a firearm. Plea Agreement at 3. Mr. Gist argues that Mr. Goldsmith should have challenged the Court's application of a two-level enhancement for possession of a firearm, because Mr. Gist never had constructive possession of a firearm at any time during the conspiracy. Petition at ECF p. 8. As discussed above, during the plea hearing, Mr. Gist stated on the record that he was aware of and understood the terms of the plea agreement. Furthermore, during the evidentiary hearing, Mr. Gist testified that, as

he had informed Mr. Goldsmith, he was willing to plead to a drug conspiracy with a gun enhancement to avoid trial, and that he knew the plea agreement contained a gun enhancement. Evidentiary Hearing Tr. 39:17-23, 47:16-24.  That version of events was consistent with Mr. Goldsmith's testimony and corroborated by Mr. Goldsmith's notes.  Therefore, because Mr. Gist knew his plea agreement included the gun enhancement and he specifically informed Mr. Goldsmith that he was willing to accept such an enhancement as part of a plea, Mr. Gist has not shown how Mr. Goldsmith's failure to challenge the enhancement at sentencing fell below an objective standard of reasonableness.

### iii.   Failure to Challenge Fine Based on Mr. Gist's Financial Status

Mr. Gist also argues that Mr. Goldsmith should have contested the $15,000 fine imposed at sentencing because Mr. Gist is indigent.  Petition at ECF p. 14.  However, the plea agreement specifically stated that the Court could impose a fine pursuant to U.S.S.G. § 5E1.2 and, that at the agreed upon offense level, the fine could range from $15,000 to $150,000.  Plea Agreement at 4. The Court reviewed Mr. Gist's financial history, specifically noting Mr. Gist's "very limited legitimate job history" with his last position being in 2011, and it determined that a fee was appropriate.  *See* Sentencing Tr. 21:14-18, 27:11-17.  Mr. Gist has not provided any evidence that the Court would have arrived at a different conclusion if Mr. Goldsmith had challenged the fee imposed, or even what additional information the Court should have considered in evaluating Mr. Gist's financial status.  Accordingly, the Court finds that this claim is also without merit.

### iv.   Failure to Request a Psychological Evaluation

Finally, Mr. Gist argues that Mr. Goldsmith failed to provide effective assistance by failing to move for a psychological evaluation to determine Mr. Gist's competency to understand the proceedings given Mr. Gist's history of depression.  Petition at ECF p. 14.  Mr. Gist has not presented any evidence that his mental health history prevented him from "consulting with counsel

to a reasonable degree of rational understanding or from having a rational and factual understanding of the proceedings against [him]." *Perez v. United States*, No. 09-CR-1153 (MEA), 2017 WL 1628902, at *5 (S.D.N.Y. May 1, 2017).  The Court notes that at the plea hearing, the Court determined, after a thorough inquiry, that Mr. Gist was "fully competent and capable of entering an informed plea, that Mr. Gist is aware of the nature of the charges and the consequences of the plea, that the plea of guilty is a knowing and voluntary plea . . . ."  Plea Hearing Tr. at 25:23-26:4.  Mr. Gist has not explained what, if anything, changed that would affect a competency assessment if one had taken place in between the plea and sentencing hearings.  In Mr. Gist's pre-sentencing submission, Mr. Goldsmith provided the Court with details of Mr. Gist's mental health history.  And as Mr. Gist admits in his petition, the Court specifically acknowledged Mr. Gist's history of depression at the sentencing hearing.  Sentencing Tr. at 20:19-22, 21:9-17, 23:16-20.  Even if the Court were to determine that Mr. Goldsmith's failure to order a psychological evaluation was unreasonable, Mr. Gist does not identify what additional information the evaluation would have revealed, why it would have been useful for the Court to know at sentencing, and how not knowing such information was prejudicial.  Thus, Mr. Gist's "self-serving assertions of incompetence warrant skepticism." *Perez*, 2017 WL 1628902, at *5.  Because Mr. Gist has not demonstrated that he suffered any prejudice from counsel's failure to move for a psychological evaluation, Mr. Gist has failed to set forth a plausible claim of ineffective assistance of counsel on this basis.

## V.    CONCLUSION

For the reasons stated above, Mr. Gist's petition is denied.  The Clerk of Court is directed to terminate the motion pending at Dkt. No. 645 in *United States v. Robert Gist*, 1:16-cr-656.  The Clerk of Court is further directed to enter judgment for the Respondent and to close Mr. Gist's civil action, *Gist v. United States*, Case No. 1:19-cv-05095-GHW.

SO ORDERED.

Dated:  August 24, 2021
New York, New York

_____
GREGORY H. WOODS
United States District Judge